This was an action for actionable negligence, brought by plaintiff against defendant alleging damage. Plaintiff was a telephone operator in the employ of the Southern Bell Telephone and Telegraph Company, and worked until 9 o'clock the night of her injury — 25 July, 1931. After working hours, she and a lady friend went to Gastonia, N.C. with two young men, over the Wilkinson Boulevard. On the return trip she was riding in the rear seat of the automobile. Plaintiff testified, in part: "Our car was struck in the rear and was torn completely up. It knocked it a long distance down the highway. The car that hit us, when I got out, was jammed into the back of our car. They were locked together. *Page 699 
We were struck right in the middle of the back seat. I was knocked against the front seat almost unconscious. Inez McLendon helped me out of the car. . . . I went to bed. I went to the hospital a week afterwards. Dr. Alonzo Myers put me there. I stayed in the hospital two weeks. He put me in a plaster cast the first day I went to see him. I have the cast on now. I have been wearing the cast for nine months. After I left the hospital I went to my apartment on East Fifth Street and stayed there about two months or a little over. I was unable to be up and have not worked since. I tried to do a little house work, but when I do I get completely worn out. I have to go to bed and rest. I was in bed two months at home and two weeks in the hospital and after that I stayed in bed the best part of the day. . . . My back pains me a lot. I was not hurt in any other part of the body but I am nervous. I was terribly bruised on the night of the accident. My arms were black and blue all over. The seat I was in was pushed up to the front and the front seat broken out. I am twenty-two years old. . . . The accident happened a little after twelve. . . . We did not stop any place — from the time we left home until the accident happened except to change drivers. We were running about twenty-five or thirty miles an hour when we were struck. It must have knocked us about fifty yards. His car was hooked up with ours. I spoke to Mr. Fite when I got out and then I collapsed after he said he was going to do all the damage he could. He deliberately backed his car back and came forward and hit our car again. I fainted but in a few minutes I came to. They pushed Mr. Fite's car back from our car to clear the road. Mr. Fite said `I am going to complete this thing.' . . . I live with my parents in Spartanburg, the first I told them of this accident was when I was taken to the hospital. My mother came but my father is an invalid." On cross-examination, the plaintiff testified that she had filed a complaint for injury by collision, which occurred 4 July, 1930, whereby her pelvic bones had been broken in three places, that she had been placed in and remained in a plaster cast for a period of four months. Plaintiff, after defendant's evidence was introduced, was recalled and testified: "I remember the date of my first injury when the pelvic bones were cracked — 4 July, 1930. I went to work after that injury about 15 November. I worked steadily after that until the night of this accident."
The car plaintiff was riding in, when hit from the rear, was on the right-hand side, in compliance with the law of the road. No obstruction to prevent anyone in the rear from seeing the car plaintiff was riding in. It was a straight road, and was a clear night. It was a hard lick, the car plaintiff was in was knocked 50 to 60 feet. Defendant denied *Page 700 
negligence, and contended that the rear light of the car in which plaintiff was riding was not burning.
Dennis Deal, witness for plaintiff, testified in part: "The center of his (Fite's) radiator hit the spare tire on my car, it was a steel wheel on the back of my car. His car was jammed in the back of my car. . . . Mr. Fite got in his car to drive it out of the road and ran into the back end of us again. Our car was torn up as much as possibly could be done to it. The rear seat was broken in two. The rear seat was knocked part of the way towards the front of the car. The front seats were broken off too. Mr. Fite's car hit my spare wheel and tore it up. . . . Mr. Fite told me everything would be all right — that he would fix everything up and not let the sheriff lock him up."
L. N. Warren, witness for plaintiff, testified in part; speaking of defendant: "I could not say who passed me before I got to where the wreck was but he was driving a yellow Ford cabriolet. The next time I saw it, it was in back of Mr. Deal's car. I will say it must have been doing sixty or sixty-five miles an hour. . . . The road was straight there. I found Mr. Fite's car in the rear end of Mr. Deal's car, it was fastened to the car. They were both in bad condition. The seats of Deal's car on the inside looked like dynamite had turned loose inside. The front seat was broken off. . . . Miss Dempster said she would rather come on to Charlotte and have her own doctor. While we were coming home, every time we would hit a little bump, she would holler with her back until she came to herself. She was unconscious until we got to Belmont. We went to the doctor's house and talked with him and she decided to come on home. We came from Belmont to Charlotte. We took her to her apartment on Fifth Street."
A. D. Nixon, witness for plaintiff, testified in part: "Before this we walked across the road. Mr. Deal called the deputy sheriff off and they were talking and I heard Mr. Fite say `Don't have me arrested, Dennis. I understand it was my fault, but I will fix everything up.' "
Sam T. Reid, witness for plaintiff, testified in part: "My home is in Gastonia — I am engaged in the automobile repair business. . . . I repaired the two automobiles but did not tow them in. . . . The body of the Deal car was damaged a great deal and the front of the Fite car was damaged a great deal. The rear panel of the Deal car caved in. Spare tire was shoved through the rear panel for a good ways. Far enough to break the back of the back seat in two, the woodwork was broken in half. The front seats were broken off, the rear part of the frame was bent. The radiator, hood, and front axle and frame of the Fite car was damaged. The radiator, the frame, the hood and the front axle of the Fite car were damaged, the radiator was pushed back into the fan. Mr. Fite's car was a yellow Ford coupe." . . . *Page 701 
Inez McLendon, witness for plaintiff, testified in part: "We left the apartment about fifteen of ten, or probably ten. Miss Dempster, Mr. Deal, Mr. Lineberger and myself. We got in the automobile — I rode in the back seat with Mr. Lineberger. We started to Gastonia and turned at fair ground and changed, I got in the front seat with Mr. Lineberger and Miss Dempster and Mr. Deal got in the back seat. We started back to Charlotte — we had not stopped on the road. Just on this side of the Hatch Hosiery Mill we were coming back to Charlotte, and all of a sudden we heard a terrific crash, we didn't know what had happened, I thought a train had hit us. We were shocked for a moment, I couldn't realize what had happened. The first thing I realized someone was flashing a light in the car. Three men were standing outside, later I found it was the sheriff, Mr. Warren and Mr. Nixon. I got out first on the outside of the road and helped Miss Dempster out. I was holding both arms around her to hold her up, she could not stand up by herself. She was complaining `Oh my back' and I couldn't do anything for her. . . . After taking with him (defendant) she crumpled down on the highway. That was back of our car, I couldn't help lift her, I called to some of the men to help me."
The defendant testified, in part: "I was coming from Lowell on the Wilkinson Boulevard, I was on the right-hand side of the road making a speed around forty-five miles an hour. When this car all of a sudden loomed up ahead of me without a tail light. I attempted to miss it and stop, but I failed. I hit the car, but I did all in my power to prevent it. . . . I broke three of my front teeth off and broke my nose. I had two black eyes and several gashes about the neck, body and a sprained ankle." The defendant denied the material allegations of plaintiff and her witnesses.
A. B. Roberson, for defendant, testified in part: "I saw the Deal car pass. The big glass door in front of the mill, as I walked up there and looked out they were coming on right slow, the front light was out and it attracted my attention. Then I went out, I kept watching them on until they went out of light of the mill which shined on the road. There was no light in the rear of their car. I saw the yellow car pass. I didn't pay much attention to it, it seemed that neither one were breaking any speed. He didn't attract my attention very much. His lights were burning. Immediately after that, I heard the noise and broke and ran up there. . . . The mill is about fifty feet from the road. I was on the inside of the mill looking out of the big glass door when the Deal car passed. I was attracted to the car because it was running so slow and because it didn't have any lights. The right-hand light was burning on the outside, the left-hand light next to me was *Page 702 
out. I also watched the tail light. It attracted my attention and I noticed it, I was coming out of the door at that time. I had done made my round and I was due to come out. I stay in the boiler room. Mr. Fite's car couldn't be very far because I just came out of the door, about the time I cleared the door and started to push it back, his car came along. I didn't see the Fite car until the crash happened. . . . I don't think either car was running at a reckless rate of speed in my opinion. . . . Q. Was there anything to hinder him from seeing the Deal car? Answer: I guess he could at that time. It was a straight road one and one-half miles. Q. There was nothing to keep Mr. Fite from seeing the Deal car if his lights were burning? Answer: . . . There was nothing between them."
W. K. Mingus, a policeman in Belmont, witness for defendant, testified in part: "I am a policeman in Belmont, I know Mr. Deal — he was driving a Ford coach. I am familiar with the car, I remember about the time this accident happened. I stopped Mr. Deal the day before this incident, because of headlight. Always when we stop a man, we examine his headlight and rear light. It had been sometime previous to this one headlight and one tail light was out. Said just the same as we tell any of them to have them fixed."
J. C. Reed, witness for defendant, testified in part: "Just about dark Mr. Deal came into the service station, bought some gas and started out and went toward Belmont and didn't have any tail light. Later on those cars came back there. He wanted to call a doctor and call a wrecker."
Dennis Deal recalled, denied what this witness testified to in part.
Dr. C. C. Phillips, witness for defendant, testified in part: "I am a physician and specialist in X-ray examination treatment. I have been in that class of business for thirteen years. I had occasion to take X-ray pictures of Miss Dempster. . . . This is the plate made on 24 September, 1931, of Miss Dempster's dorsal spine. . . . Taking the sixth and seventh dorsal, I find this deviation in the seventh and eighth, as to my count of the vertebrae. Here is the eighth showing a very slight deviation from this one, for instance. This one is a little hollowed out at the front part of the body of the vertebra. We find above that a projection downward of the lower surface of the body, which compensates for that little depression. We find the same thing in the bodies of the vertebrae a little below, that lead us to believe that was not due to injury, but result of the condition of the individual, her posture as she grew up, that caused the bone to develop in that way. That was our opinion in that case, and in our opinion there is no fracture. We examined her *Page 703 
at the request of Dr. Myers and gave this report. The condition of the dorsal spine is the same as at previous examination which we made on 24 September, 1931. It is our opinion that the condition of the vertebrae is normal in this individual, and not a result of injury."
Dr. O. L. Miller, witness for defendant, testified in part: "My profession is bone joint surgery. I do some surgery at Orthopedic Hospital in Gastonia. I have an office in Charlotte. I have been specializing in orthopedic surgery for about fifteen years. I have a good X-ray in my place here. I had occasion to take X-ray pictures of the back of Miss Dempster the latter part of September, about the 20th of September, 1931. I have those plates with me. One is from the side and one from the front. I will put the front X-ray plate up here first placing same in the light on the judge's desk. I don't see any fracture in this plate. If they were there I think they would be evident. She has rather narrow inter spaces between the vertebrae up in the dorsal section. I took another picture. I don't think I would want to satisfy myself without another view. This one is lateral view of the lady's spine, taken through the side. No evidence of fracture there, no evidence that there has ever been any fracture."
Dr. Stephen Gaul, witness for defendant, testified in part: "I do bone joint surgery. I have been doing that since 1915. I graduated in Philadelphia. I had two years internship and after that I was at the Walter Reid Hospital. This picture is anterior posture view of the spine of Miss Dempster. She has narrowing of the spaces between various vertebrae, and also some narrowing along these vertebrae and a lipping here, otherwise it is nothing else. I am not satisfied from this view to give an opinion on that. In the picture taken by Dr. Phillips she has a posterior condition — round back, narrows at these spaces, she has narrowing in this vertebral space and this one. That condition exists in a number of vertebrae in the dorsal region. I have looked at these before and seen no fracture, particularly in the seventh and eighth dorsal vertebrae there is no fracture. . . . I don't see anything that would disturb the functional use of the spine in its ordinary movements. I don't see anything that would cause pain."
The plaintiff in rebuttal recalled Dr. J. Rush Shull, an expert, who without objection testified contrary to the expert testimony of defendant's witnesses. Both plaintiff and defendant proved their characters were good.
The usual issues of negligence and damage were submitted to the jury, who answered in favor of plaintiff. Defendant made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones and other material facts will be considered in the opinion. *Page 704 
There can be no question that the evidence was abundant to have been submitted to the jury on the question of negligence and damage. In fact, there are no exceptions or assignments of error as to the charge of the court below in defendant's brief. Part Rule 28 (200 N.C. at p. 831), is as follows: "Exceptions in the record not set out in appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned by him."
Plaintiff testified that on 4 July, 1930, she had received an injury in an automobile collision and that her pelvic bones had been broken in three places. She went to work after this injury, on 15 November, 1930, and worked steadily thereafter until the collision and injury for which this action was instituted.
On the question of injury, Dr. J. Rush Shull, a witness for plaintiff, an expert X-ray specialist, who took X-ray pictures of plaintiff many times and on different occasions, testified in part: "We found in both examinations — 30 and 31 July — the compression fracture of the bodies of the sixth and seventh thoracic vertebrae." On cross-examination:"This was the only place she complained of — I did not take an X-rayof the pelvic region.. . . I am confident that there has been a fracture because the vertebrae has come closer together in those two places. Ordinarily the X-ray takes nothing but the bony tissue — does not take the nerves."
Dr. Alonzo Myers, an expert bone surgeon, witness for plaintiff, testified in part: "All of these findings with history, indicated to me that she was having severe pain in her back. . . . I felt she must have some injury in the vertebrae and warned her to go to the hospital and have an X-ray made. . . . In a few days I got her there and had X-ray made, it showed that she had a fracture of the seventh and eighth dorsal vertebrae. I applied plaster paris cast from her waist to axilla in order to take the motion out of the back. I have kept her under observation since then. Seen her from time to time; had her rechecked by X-ray about every two months. . . . In my opinion, based upon experience and study, to mobilize or keep it straight with a cast for a period of a year, and often longer, even though the symptoms have disappeared you will be afraid of reoccurrence, which will make it worse. She has not been able to work since the injury. She will not be able to do anything which will require the use of her spine — certainly not now."
The defendant introduced Dr. C. C. Phillips, an expert, who testified: "The condition of the dorsal spine is the same as at previous examination *Page 705 
which we made on 24 September, 1931. It is my opinion that the condition of the vertebrae is normal in this individual, and not a result of injury." Also Dr. O. L. Miller, an expert in orthopedic surgery, who testified: "No evidence of fracture there, no evidence that there has ever been any fracture." Also Dr. Stephen Gaul, expert, testified: "I have looked at these before and seen no fracture, particularly in the seventh and eighth dorsal vertebrae there is no fracture. . . . I don't see anything that would disturb the functional use of the spine in its ordinary movements. I don't see anything that would cause pain."
There was no objection on either side to the above opinion evidence. The plaintiff's expert testifying that there was a fracture of her spine in two of the vetebrae [vertebrae]. Defendant's experts testifying "the condition of the vertebrae is normal, in this individual and not a result of injury" — "no evidence that there has ever been any fracture" — "there is no fracture."
The pelvic bones of plaintiff, which had been broken more than a year before in a collision, before the collision for which this action is brought, the record discloses had gotten well and plaintiff had gone to work. Dr. Myers testified "She had no indication or symptom of pain in her back then, she returned to work after that." From the evidence we can see no causal relation between the pelvic bone injury and the present alleged injury.
Defendant contends that three points are involved: (1) Hypothetical question to medical expert by plaintiff without placing burden on plaintiff to show by greater weight of evidence, the assumed state of facts. (2) Allowing medical expert to testify that certain condition was caused by the accident. (3) Form of hypothetical question propounded to medical expert.
On the first aspect defendant contends: "The hypothetical questions propounded by the plaintiff are fatally defective in that they were not based on the hypothesis that the jury should find the facts to be true bythe greater weight of the evidence. The burden was on the plaintiff and she must carry the burden continuously throughout the trial." The defendant cites no authority as to the greater weight of the evidence necessary in the hypothetical questions.
On the two issues submitted to the jury in the action, the court below charged correctly, as follows: "The first issue is: `Was the plaintiff injured by reason of negligence of the defendant, as alleged in the complaint?' The burden of that issue is upon the plaintiff. It is encumbent upon plaintiff to satisfy you by the greater weight of the evidence, that is evidence which outweighs or preponderates all other evidence in this case; whether introduced by plaintiff or defendant, that *Page 706 
plaintiff was injured by reason of negligence of defendant as alleged in the complaint. Second issue: `What damages, if any, is the plaintiff entitled to recover of defendant?' The burden of that issue is uponplaintiff to satisfy you by the greater weight of the evidence, as to whatdamage she is entitled to recover."
In Parrish v. R. R., 146 N.C. at p. 126, the hypothetical question begins practically like the ones objected to in the present action: "If the jury find the facts to be from the evidence, that the plaintiff was injured by falling back against the arm of a seat in the train," etc. The Court found no error as to the form of the hypothetical question in the Parrishcase, supra.
As to the second aspect "Allowing medical expert to testify that certain condition was caused by the accident": All the evidence, other than that of the defendant's expert witnesses, indicated that the impact was such as to cause injury to plaintiff and her condition thereafter. The general principle in regard to expert testimony is laid down in the Parrish case,supra, at pp. 127-8: "We cannot agree with the learned counsel of the defendant that this case bears any resemblance to Summerlin v. R. R.,133 N.C. 550. In that case the questions excluded by the court were so framed as to require the witnesses to express an opinion as to the existenceof a fact which was controverted, and it was there said by the Court that this was not the proper form for the question to take, but that the expert's opinion should be founded upon a hypothetical question containing astatement of facts which the jury might find from the evidence, and supposing, of course, that they will find them to be as stated in the question. (Italics ours.) . . . (p. 128.) The question was not so put to the witness `as to require him to draw a conclusion of fact nor to pass upon the effect of the evidence in proving controverted facts,' but merely to express his opinion upon the facts stated in the question, leaving them to be found exclusively by the jury." Hill v. R. R., 186 N.C. 475.
In the present case, following the precedent in the Parrish case, supra, the hypothetical questions were premised on the jury finding the facts to be from the evidence. Dr. Lewis, in the Parrish case, supra, answered: "In my opinion, the kidney was dislocated by the fall, and the dislocation is permanent, and the plaintiff will be disabled for life, unless he has the kidney removed by an operation."
In the present action Dr. Shull, an expert witness for plaintiff, testified on cross-examination by defendant: "I am confident that there has been a fracture because the vertebrae have come closer together in those two places. Ordinarily, the X-ray takes nothing but the bony tissue — *Page 707 
does not take the nerves." On redirect examination, the proper hypothetical question was propounded by plaintiff, as follows: "If the jury should find from the evidence that this young lady on 25 July, 1931, was riding in the rear seat of an automobile on Wilkinson Boulevard, in Mecklenburg County, and should further find that an automobile traveling at the rate of sixty or sixty-five miles an hour should strike the rear of the car in which she was sitting, breaking the seat in two and throwing plaintiff forward, and if the jury should further find that she immediately complained of her back and should further find in a few minutes thereafter she fainted, and if they should further find that she was taken to the hospital and that since that time she has been unable to perform manual labor, and has been in a plaster cast for the last eight or nine months, have you an opinion, satisfactory to yourself as to what caused the condition you find in the vertebrae as disclosed by the X-ray pictures? Answer: Yes, I have an opinion. Q. What is it? Answer: The accident caused the injury." Lynch v.Mfg. Co., 167 N.C. at p. 100; Riggs v. R. R., 188 N.C. 366; Shaw v.Handle Co., 188 N.C. 222; Buckner v. R. R., 195 N.C. 654; S. v. Fox, 197 N.C. at p. 486.
It must be noted that all the evidence, except that of defendant's expert witnesses, was to the effect that plaintiff was to some extent injured in the collision. The hypothetical questions were not addressed to the issue of negligence, but on the issue as to the extent of the injury. The answer of the doctor "The accident caused the injury." Taking the question and answer together, on the question of damages, we do not think the answer impinged the jury rule to such an extent that it should be held for prejudicial or reversible error.
In the Parrish case, supra, the cause and extent of the injury was stated and this was not held to be error. We can see no error in the question propounded to the expert Dr. Shull, and his answer thereto: "Yes, I have an opinion from my examinations and X-ray as to whether this girl's injury is permanent. Q. What is that? Answer: It is total and permanent."
In Martin v. Hanes Co., 189 N.C. at p. 646, Adams, J., we find: "These cases enunciate the principle that, while a medical expert may not express an opinion as a controverted fact, he may, upon the assumption that the jury shall find certain facts to be as recited in a hypothetical question, express his scientific opinion as to the probable effect of such facts or conditions."
On the third aspect: "Form of hypothetical question propounded to medical expert" — The form and answer to the hypothetical questions *Page 708 
may not be as technical as perhaps they should be. In N.C. Handbook on Evidence (Lockhart) 2d ed., p. 240, part sec. 203, the following observations are made: "The general rule is that opinion evidence is inadmissible, and the triers of a matter in dispute — the judge or the jury as the case may be — draw their conclusions from facts testified to before them, and not from opinions expressed by others. There are three classes of exceptions to the above rule. The court will admit (1) opinions of experts, (2) opinions on the question of identity, and (3) opinions which, from necessity, must be received. . . . (Sec. 204.) An expert may express an opinion, but he must base his opinion upon facts within his own knowledge, or upon the hypothesis of the finding by the jury of certain facts recited in the hypothetical question. . . . (Sec. 209.) As pointed out, the exceptions to the opinion rule as based upon the justification that the ends of justice may be more readily met by assisting the jury with the opinion testimony. Assuming that the requirement of relevancy is taken care of, the court is then confronted with two queries: (1) Is the province of the jury invaded? (2) Will the opinion materially assist the jury? In the application of the queries to the particular case, while the courts have attributed various reasons for the exclusion or admission of the testimony, it is submitted that no rules, nor formulas, can be satisfactorily deducted from the results reached."
In Cochran v. Mills Co., 169 N.C. at p. 64, Walker, J., said: "The questions to the expert were properly framed and were supported by evidence. Summerlin v. R. R., 133 N.C. 554; Parrish v. R. R., 146 N.C. 125;Shaw v. Public-Service Corp. (168 N.C. 611), supra. Besides, it appears that upon striking a general balance the advantage of all the questions and answers was largely in favor of defendant. If there has been error, no harm would have resulted to defendant."
In the present action plaintiff had two experts and defendant three, testifying in regard to the injury. The defendant's three experts testified there was no injury, the plaintiff's that there was. On all the facts and circumstances of this case; conceding, but not deciding there was error, we cannot hold it as prejudicial or reversible. In the legal battle as to opinion evidence between the able counsel in this action, it seems as if "honors were easy." The questions of fact were decided by the jury in favor of the plaintiff. We find in law
No error. *Page 709