STACY, C. J., concurs.
This is a civil action brought by the plaintiff to recover of the defendants damages for an alleged breach of an implied warranty in the contract of sale of certain loaded gun shells — 12-gauge scatter load shells, manufactured by the Remington Arms Company.
The issues submitted to the jury and their answers thereto are as follows: *Page 803 
"1. Was the plaintiff injured by a breach of an implied warranty that the gun shells sold by the defendants to the plaintiff on 24 December, 1934, were reasonably fit for the purpose for which the gun shells were sold and purchased, as alleged in the complaint? Answer: `No.'
"2. What damages, if any, is the plaintiff entitled to recover? Answer: ............."
On the verdict the court below rendered judgment. The plaintiff made numerous exceptions and assignments of error and appealed to the Supreme Court. The material ones will be considered in the opinion.
This action was tried in the court below on the theory alleged in the complaint that the damage to plaintiff was caused by the breach of an implied warranty in the sale of certain 12-gauge scatter load gun shells, sold by defendants to plaintiffs. The defendants made no motion in the court below for judgment as in case of nonsuit. C. S., 567. Jones v. Ins.Co., ante, 559. This theory was recognized in the charge of the court below: "If you find from the evidence in the case, and by its greater weight, the burden of proof being upon the plaintiff Thomas W. Keith to so satisfy you, that the gun shells sold by the defendants to the plaintiff on 24 December, 1934, were not reasonably fit and proper for the purpose for which the gun shells were sold and purchased, and that by reason of any such unfitness or defect a gun shell purchased by the plaintiff from the defendants exploded in the left barrel of plaintiff's gun on Christmas day, 1934, when the plaintiff was hunting quail, blowing out part of the left barrel of plaintiff's gun, was the direct proximate cause of plaintiff's injuries, it will be your duty to answer the first issue in this case `Yes'; if you fail to so find, it will be your duty to answer the first issue in this case `No.'"
In Thomason v. Ballard Ballard Co., 208 N.C. 1 (4), Connor, J., for the Court, says: "There are decisions in this jurisdiction to the effect that as between a vendor and his vendee there is an implied warranty that the personal property sold by the vendor and purchased by his vendee was fit for the use for which it was sold and purchased, and that the vendor is liable to his vendee for a breach of this warranty. Swift v. Aydlett,192 N.C. 330, 135 S.E. 141; Poovey v. Sugar Co., 191 N.C. 722,133 S.E. 12; Swift v. Etheridge, 190 N.C. 162, 129 S.E. 453." Tomlinson v.Morgan, 166 N.C. 557; Ward v. Sea Food Co., 171 N.C. 33; Corum v. Tob.Co., 205 N.C. 213. "An appeal ex necessitate follows the theory of the trial." In re Parker, 209 N.C. 693 *Page 804 
(697). The trial theory of the case is controlling on appeal. Mercer v.Williams, ante, 456 (458).
The matter of implied warranty is treated in the briefs of the litigants, and the case was tried on this theory in the court below. The defendants' contentions will not now be considered on this record — that in no event could plaintiff recover.
The plaintiff alleged that the damage to him was caused by a breach of an implied warranty in the sale of certain 12-gauge scatter load gun shells; that one, when shot by him, bursted the gun and caused serious injury to his left hand and thumb. The defendants in answer say: "It is admitted that the plaintiff's gun exploded, and that his left thumb and hand were hurt, and that he suffered pain and some expense for medical attention, etc. It is particularly denied that this occurred from any negligence on the part of the defendants, or any breach of warranty, and in connection therewith the defendants allege that they are informed, believe, and allege that either the plaintiff's gun was defective or that the plaintiff was negligent in getting some obstruction in said gun, and in shooting the same with an obstruction in it."
The facts: The plaintiff bought the shells on 24 December, 1934, from defendants, and on the next day (Christmas) he and his friend, W. P. Emerson, went hunting. He testified: "When we got up to where we were going to park (Currie) and Mr. Emerson took my gun out of this case here while I got my shells out and got my coat on, and I broke the gun open and put two of these shells in my gun. . . . We walked on behind the dogs, I should say 300 yards from where we got out of the car, and the dog pointed. . . . Mr. Emerson was to my left, and I was on the right. I shot the right barrel and it made a terrific explosion, it was unusually heavy, and I shot the left barrel and it blew this piece of shell through my hand and blew my arm away from the gun. . . . I cleaned it and the barrel was as bright as a new silver dollar. I examined it to see its condition and found no defects whatever. . . . Mr. Emerson was shooting a Remington automatic gun, 20-gauge, I think it is. I had seen his gun, and he told me he was shooting those Nitro Club scatter load shells, loaded with No. 8, manufactured and put up by the Remington Arms Company. . . . I was opening my box of shells and getting on my hunting coat and putting some shells in my hunting coat while Mr. Emerson was getting my gun out of the case." On recall, he testified: "Mr. Emerson got the gun out of the case while I was putting some shells in my pockets. After Mr. Emerson handed me the gun and before I put the shell in it, I opened, or unbreached it, held it up to the light and looked through it through force of habit to see that there was nothing in the barrel, and there was nothing in the barrel." *Page 805 
W. P. Emerson testified in corroboration of plaintiff, as to his going hunting with him and as to the explosion, and on cross-examination testified: "When we got up there he was putting this box of shells out and opening it and he broke the seal, and was putting the shells in his hunting coat pocket. I took his gun out of the case and was looking at it. I am under the impression that I broke it, but I cannot say definitely. . . . I don't remember when I loaded my gun. I did not drive up there with it loaded. After we stopped, while he was getting his coat on and putting shells in it, I was getting out the gun. I loaded mine some time about that time as we started off. I was shooting 20gauge Remington Nitro scatter load shells."
The defendants offered in evidence W. T. Ashcroft, superintendent of the loading department of the Remington Arms Company, who testified, in detail, the precautions that are taken in loading these shells, that it was impossible to overload one, that if an overcharge of powder should get in a shell the machine would stop, etc.
W. A. King testified for defendants: "I am employed by the Parker Gun Company, in the manufacture of Parker guns. I have been with the Parker Gun Company over 46 years. I am supervisor of quality, responsible for the proper manufacture and quality of the guns manufactured. I first learned the mechanical trade, was tool maker, and took up die sinking, and was placed in charge of forging of all parts; then I was placed in charge of the machining of all parts; in 1912 I was made assistant superintendent, and in 1914 superintendent, and a few years after that works manager, in charge of the entire plant. In my work I have made guns and the different parts, and have tested them. I have made all parts that go into a gun, or had them made under my immediate supervision." The court below held King was an expert on shotguns. "At the request of Gregg Brothers, I came down here previous to this and made an inspection of this gun of Mr. Keith's, in the presence of Mr. Keith, and of me and of Judge Williams and Judge Bryan, in Mr. Wright's office. This is the same gun that I then inspected. Q. From your experience, state what you see there from your observation of that burst that indicates anything about the cause of the burst. Ans.: A distinct swell, or ring, running around the barrel (which the witness points out to the jury). There is evidence of foreign material. I have got a glass, and in looking at it I see it is brass. It is right here on the break; that is a difference in color; it is yellow. (Witness points it out to the jury.) Q. From the evidence of that you see there, and have just shown there on that gun, what, in your opinion, was the cause of the gun bursting? (Judge Bryan: Objection to the form of the question. Court: Sustained, but if you will ask what, in his opinion, caused it, I will permit it.) Q. Please state, in your opinion, what caused that gun *Page 806 
barrel to burst. A. The presence of a twenty-gauge loaded shell in the barrel, and a twelve-gauge loaded shell placed in back of it and fired and the twenty-gauge shell exploding at the same moment the twelve-gauge shell exploded. The brass burned in there is from the side wall of the twenty-gauge shell. Court: Mr. King, are you expressing your opinion from your examination of that, or from what you heard and also from your examination of that barrel? A. I am expressing my opinion from the examination of that barrel, and many tests I have made with barrels, and produced exactly similar bursts. I have a barrel of a twelve-gauge gun that I have tested in that manner, at the hotel. I didn't bring it to the court with me. I have made tests as to the overloaded shells with extra large quantities of powder or explosives. In my opinion an extra heavy loaded shell would not have caused a gun to burst at that point. It would burst in the breach, in the chamber. Right here, where the load would be chambered; it would tear the chamber up. It might extend forward and will not be confined to that point. It might tear the barrel so badly as to extend further forward than the exact length of the chamber. The result on the empty shell of such an explosion, made with high pressure shells, would tear the shell apart. Q. Please state if, in your opinion, an extra heavily loaded gun shell would cause a burst like that. A. No, sir. (Court: He has already testified to that.) A. The bulge I spoke of is always caused by an obstruction. When there is an obstruction in the gun barrel, the load being driven up to the obstruction is momentarily held up, which causes extra high pressure, and causes a ring, or bulge. The length of the chamber in that gun, for the explosion of the shell, is slightly over two and five-eighths inches long, and these Nitro Club scatter load shells are a fraction longer than this chamber, as they are two and three-quarters. The effect of using that kind of shell in a gun of a short chamber is that it tends toward raising the breach pressure somewhat." To the material portions of the testimony of the expert, King, above set forth, plaintiff excepted and assigned error. We think the testimony was competent. On cross-examination he testified, in part: "I say there is brass there, a very small particle, big as a pin head. I would not say how much larger. Q. You are sure that is not rust? A. I am sure it is brass. . . . Q. If the jury found this shell came out of there, you would say, in your expert opinion, this shell didn't blow this gun open, would you? A. If I knew that shell did come out of that chamber, and I knew that shell had been fired? Q. Yes? A. No, but I would say the twenty-gauge ahead of that shell did it. Q. You mean the difference in the calibre? A. A loaded twenty-gauge shell was in that barrel, and assuming that was the shell that was fired, when these shells were fired and exploded, the twenty-gauge caused the damage. Q. You mean there *Page 807 
were two shells in there? A. Yes, sir. Q. You base your expert opinion on that? A. Yes, sir." The same testimony appears in the record elicited by plaintiff. Albritton v. Albritton, ante, 111 (114). The testimony of the expert, King, was admissible in evidence, the probative force was for the jury to determine.
Shaw v. Handle Co., 188 N.C. 222, was tried by Devin, J., when he was on the Superior Court bench, and he permitted a physician, an expert, to testify on personal knowledge, observation, etc., as to the cause of the death of two men found dead in a closed gasoline boat — that it was carbon monoxide gas. At p. 232, this Court said: "Dr. Garriss saw the boat, the condition of the two men, how they were lying, the windows down, and, by personal observation, had knowledge of the entire situation. With this personal knowledge and observation of all the facts, and Dr. Garriss' training and experience as a physician, we think this evidence competent. Its probative force was for the jury," citing Flaherty v. Scranton Gas andWater Co., 30 Pa. Superior Court Rep., 446. "In that case (Flaherty case,supra), nor in the case at bar, was there an autopsy. The examination in each case was external and all the surrounding facts known to the physicians. They knew the facts, and on the known facts gave their opinion. Their education and training were for the purpose of enabling them to deal with and express their opinion as to what ills and the causes that constantly threaten and affect humanity. In Davenport v. R. R.,148 N.C. 294, Hoke, J., says: `Even if it should be regarded as more strictly "opinion evidence," when it comes from a source of this kind, from one who has had personal observation of the facts, and from practical training and experience is qualified to give an opinion which is likely to aid the jury to a correct conclusion, such evidence is coming to be more and more received in trials before the jury. McKelvey speaks of it with approval as "expert testimony on the facts." McKelvey, p. 230.' S. v. Morgan,95 N.C. 641; Jones v. Warehouse Co., 137 N.C. 337; Jones v. Warehouse Co.,138 N.C. 546; Lynch v. Mfg. Co., 167 N.C. 98; Ferebee v. R. R.,167 N.C. 290. . . . The evidence in Summerlin v. R. R., 133 N.C. p. 551, was excluded in the lower court, and sustained, `upon the ground that the witness was called upon to state a fact of which he had no personal or competent knowledge, and not merely the opinion of an expert. The opinion of the witness should be based upon facts admitted or found, or upon his personal knowledge, and not upon the assumption of the fact. The question should therefore be hypothetical, or rather supposititious, in form, following the precedents as settled in our decisions.' Mule Co. v. R. R.,160 N.C. 252; Hill v. R. R., 186 N.C. 475." S. v. Hightower, 187 N.C. 300
(307); S. v. Fox, 197 N.C. 478 (486); Dempster v. Fite, 203 N.C. 697
(706-7); Green v. Casualty Co., 203 N.C. 767 *Page 808 
(772); S. v. Atlantic Ice Coal Co., ante, 742. From the view we take of this case, we see no error in the charge of the court below.
The facts and circumstances on which the expert based his opinion were practically uncontroverted. Perhaps Emerson's testimony indirectly corroborated the expert's opinion. The plaintiff testified there was nothing in the barrel when he put the shell in, yet his companion, Emerson, who was shooting a 20-gauge and plaintiff a 12-gauge shell, testified that he took plaintiff's gun out of the case and was looking at it and was under the impression that he broke it, but could not say definitely. He never said that he did not put the 20-gauge shell in the plaintiff's gun. It may be that he unthoughtedly put the 20-gauge shell in it. This was a legitimate circumstance for the jury to consider. This was a fact within the witness' knowledge.
For the reasons given, we find
No error.
STACY, C. J. concurs.