SEAWELL, J., concurring.
BARNHILL, J., dissenting.
STACY, C. J., and WINBORNE, J., concur in dissenting opinion.
This is a claim made by plaintiffs against the defendants before the North Carolina Industrial Commission, under the N.C. Workmen's Compensation Act, for the death of W. S. Blassingame, who was an employee of the Southern Asbestos Company, the employer, and defendant Maryland Casualty Company, carrier.
The claim was for injury resulting in death, on 1 April, 1937, in Lithonia, Ga. It is alleged that the death was caused by pulmonary asbestosis resulting in lombar pneumonia. On the hearing before Commissioner J. Dewey Dorsett, the claim was denied, and on appeal the hearing Commissioner was reversed by the Full Commission.
The evidence was to the effect that W. S. Blassingame, upon his death on 1 April, 1937, left a widow and one child, a minor, the plaintiffs. That he worked for defendant Southern Asbestos Company for seven years, off and on. The last period was from January, 1936, until he died. From 1933, while working for defendant, he developed a slight cough which continued until his death. It got worse and worse from 1 January, 1936, until his death.
Mrs. W. S. Blassingame testified, in part: "Q. What was the condition of his health with reference to his coughing in the spring of 1936? Ans.: It was terrible, that is when it was so bad. Q. Well, now, just describe to the court how he was affected, what effect this coughing had on him? Ans.: Just at the time his feet hit the floor in the morning he would start coughing. I have never heard anybody cough like he did. Plenty of times I have seen him cough until his fingernails would be black, as black as they were when he died, his head and face would be just as red as fire, he coughed continually from the time he got up in *Page 225 
the morning until he had eaten breakfast. After he ate breakfast it seemed just to get a little better, he'd have a bad coughing spell and get over this. He coughed continually from the time his feet hit the floor in the morning until he had eaten breakfast every morning. Q. Did that coughing continue on up until his death? Ans.: Yes. . . . Q. State, Mrs. Blassingame, whether or not he was examined by doctors and if so, when and what doctors? Ans.: You mean at the plant? Ans.: Yes. Ans.: Well, the State doctor from Raleigh, Dr. Easom, examined him in January, 1936, that is just a few days after he came back here and went to work and then they examined him on Tuesday before we left here to go to Georgia; Friday, I think it was March 23, if I am not mistaken, anyway it was on Tuesday before Easter Sunday, they examined him again. . . . Q. I believe you say he was reexamined March, 1937? Ans.: March 23, 1937. Q. Between January 27 and March 23, was he treated by any other doctor? Ans.: Dr. Gallant. . . . Dr. Gallant examined him on Friday and two weeks from that day he was buried, which was the second day of April. Q. Dr. Gallant examined him before his last examination by Dr. Easom? Ans.: Yes."
Neither doctor advised her as to what his trouble was. W. S. Blassingame died in Lithonia, Ga., where his wife's people lived. They went down on a vacation, left Charlotte in an automobile Friday morning about 8:00 o'clock and reached Lithonia about 5:00 o'clock that evening. On the way the deceased had headaches. "Q. When you reached Lithonia about 5:00 o'clock in the afternoon what was his condition at that time? Ans.: He was still suffering with the headache and I would think he was running a temperature then, his face was just as red as could be and when we got there he got out of the car and walked in the house and lay down across the bed. . . . I didn't think that he would get up any more that night, I felt like he was too sick, I insisted that he undress; just about the time I got him undressed he had a chill and that is when I sent for the doctor. Q. And what doctor did you send for? Ans.: Dr. Thos. W. Stewart. Q. About when did he get there? Ans.: I think it was around 7:30 or 8:00; I will say it was around 8:00 o'clock. Q. I believe Dr. Stewart finally pronounced it pneumonia, did he? Ans.: Yes, sir. Q. That was on March 26? Ans.: Yes, sir. Q. He died on April 1, I believe? Ans.: Yes, sir. Q. Mrs. Blassingame, during the period from the time of your marriage, did Mr. Blassingame have any other illness of any consequence? Ans.: No, sir, nothing except catarrh, he was kind of bothered with catarrh of the head, that was the only thing I ever heard him complain of except this cough." *Page 226 
Dr. R. M. Gallant, a medical expert, testified, in part: "Q. Did you know W. S. Blassingame? Ans.: Yes, sir. Q. Were you ever called to treat him? Ans.: Yes, sir. Q. When was that? Ans.: Some time about March, 1937. Q. About the first or latter part of March? Ans.: I don't remember. Q. What was his condition, what was his complaint at that time? Ans.: He complained of a persistent cough which came on with paroxysms, uncontrollable by any ordinary means, accompanied by shortness of breath and general weakness. Q. What kind of treatment did you give him? Ans.: Well, he did not have any temperature, and he had some paroxysms of coughing and spells of coughing while I was examining him, it kind of baffled me from the beginning, with all the cough and perhaps a rapid pulse which he had, which I figured might be due to his spells or paroxysms of coughing, I didn't know hardly what to think of it, no temperature, but I gave him the ordinary usual treatments for a simple bronchitis and told him to come back at such and such a time, which he did and to come back sooner if the medicine didn't seem to relieve him, well he came back sooner and said it done him absolutely no good. Well, after 22 years experience I have always been able up until I saw him to at least relieve anybody temporarily, even though I wasn't able to cure them, I gave him the strongest cough sedatives that I knew, including some morphine in it, he came back and said absolutely no relief and with his chest symptoms that he had I told him I just didn't know what the trouble was, he had some kind of peculiar condition in his chest that in 22 years experience I had never seen anything like it, the only thing I saw to do was to treat him symptomatical and wait for developments, I knew he was up against it, I didn't know what to do, I told him I would either suggest some so-called specialist or he could stick to me and I'd do the best I could, he came back and a time or two seemed to be a little bit better, the treatment seemed to be no good, the next thing I heard he was dead down in Georgia. . . . Q. Did you ever see copy of the report of the autopsy made by the U.S. Public Health Service? Ans.: Yes, sir, I was sent a copy of it and also I received a very nice, courteous letter from the doctor who treated him. Q. Dr. Stewart? Ans.: Yes, sir, saying that he had sent the letters properly prepared — saying that he had sent the lungs properly prepared in formaldehyde to the State Laboratory, he had asked them to also send me a copy of the report and which I thought was very nice indeed and which I received in due time. Q. Did you study this report on the autopsy? Ans.: Yes, sir. Q. Did you get also a copy of Dr. Easom's report of his two examinations? Ans.: Yes, sir. Q. Did you study that? Ans.: Yes, sir. Q. Well, doctor, from your examinations of the report of the autopsy made by the U.S. Public Health Service and the report of Dr. Easom's examinations of the *Page 227 
Medical Advisory Board and if the Commission should find that W. S. Blassingame at the date of his death was 27 years of age, that he had worked approximately 7 years in an asbestos plant as a weaver, that he had apparently been in good health prior to the spring of 1936, at which time he started coughing very badly and continued to do so especially in the mornings until the date of his death on April 1, 1937, that he was examined by medical experts on January 27, 1936, and at that time an X-ray made of his lungs which showed a ground glass appearance, in the wall portion of either lung field and was diagnosed as asbestosis No. 1; that in the early part of March, 1937, he was treated by a doctor for a peculiar chest or bronchial condition characterized by uncontrollable coughs, even after administering sedatives or narcotics which usually controls or relieves same for a short time at least; that he was reexamined on March 23, 1937, by medical experts; that the examination of his lungs at that time showed inconstant, dry crackling rales in both bases, both anteriorly and posteriorly, the diaphragm seemed to descend wholly on both sides, his condition at that time was diagnosed as asbestosis, that he went to Lithonia, Ga., on March 26, 1937, arriving there about 5:00 p.m.; that he was sick when he arrived and before 8:00 o'clock p.m. of the same day developed a chill and high fever, was coughing and expectorating prune-colored sputum, had a most peculiar sounding lung, sounding very different than that, that was found in ordinary pneumonia cases, his condition was diagnosed as pneumonia, lobar, right upper and middle lobes, from which he died on April 1, 1937, if the Commission should find those facts from the testimony and greater weight, have you an opinion satisfactory to yourself as to what the proximate cause of his pneumonia was. Ans.: I do. Q. What is that opinion? Ans.: Pneumonia-asbestosis. Q. What do you mean by that? Ans.: I mean pneumonia which was brought on by lowered resistance due to previously having had asbestosis. (On cross-examination.) Q. At that time you knew he was working? Ans.: As well as I remember he wasn't working regular, if he was he wasn't able to work. Q. If it should be found that he was working regularly from the time you first saw him the first week in March up until March 25, have you an opinion satisfactory to yourself as to whether or not he was able to work? Ans. Yes, I have. Q. What is that opinion? Ans.: I don't think he was able to work, any man with the condition he had and shortness of breath, should have been in bed. Q. You don't think he should have worked even though he worked? Ans.: He should not have worked even though he did work."
Without setting them forth in detail, we think the hypothetical question was premised on the facts of record in this case. *Page 228 
Dr. J. Rush Shull, admitted to be an expert, testified in part: "Q. Dr. Shull, I believe you have had considerable experience in examination and observation of asbestosis cases, have you not? Ans.: Yes, I have had a fair experience with it in the last 4 years. Q. Doctor, have you ever performed or entered in the performance of an autopsy on an asbestosis victim? Ans.: Yes, sir, I have had four. Q. Doctor, have you read and studied the report of Dr. Miller of the United States Public Health Service and report of Dr. Easom of the Medical Advisory Board? Ans.: About this case? Q. Yes, sir. Ans.: Yes, I have." He was asked the same hypothetical questions as Dr. Gallant, and answered: "Q. Where I said 1933, I meant 1936 and 1937? Ans.: Yes, I think his asbestos is was a proximate cause of his death. Q. In other words, what was the proximate cause of his pneumonia, the question was, have you an opinion satisfactory to yourself as to what the proximate cause of the pneumonia was? Ans.: Yes, I have an opinion. Q. What is that opinion? Ans.: The asbestosis that he had."
Dr. W. M. Summerville testified, in part: "Q. Where did you get your medical training? Ans.: University of North Carolina and Emory University. Q. You specialize in pathology? Ans.: Yes, sir. Q. You have practiced your profession here in Charlotte since you graduated? Ans.: Yes, sir. Q. Have you had any experience with asbestosis cases? Ans.: Yes, sir. Q. How many cases have you seen? Ans.: I have done autopsies on two. Studied three others clinically and studied the tissue from four. (By the Court.) Let the record show he is an expert. Q. Have you read the report of the Medical Advisory Board and also Dr. Miller's report of autopsy in this case? Ans.: Yes, sir." He was asked the same hypothetical question as Dr. Gallant, and answered: "I do. Q. What is that opinion? Ans.: I think the pneumonia was the contributory cause or proximate cause, the asbestosis was the proximate cause of pneumonia and pneumonia caused his death. Q. Was the proximate cause of pneumonia and pneumonia caused his death? Ans.: Yes."
W. S. Blassingame was a weaver in defendant Southern Asbestos Company's plant — a broadcloth weaver.
Dr. H. F. Easom, an expert, testified for defendant in part: "Q. What is asbestosis? Ans.: Asbestosis is defined as a disease of the lungs caused by the prolonged inhalation of the asbestos dust and characterized by the forming of fibrous tissue throughout the lungs. Q. In lay language, what is fibrous tissue that you find in the lungs of asbestosis victims? Ans.: Fibrous tissue is commonly known as scar tissue and it is the response of normal tissues to injury. Q. What does it do to the lung? Ans.: It eventually encroaches on the air containing portions of the lung and destroys them. Q. What are the usual symptoms that you find in a man or a woman suffering with the disease known as asbestosis, that is, *Page 229 
the clinical symptoms? Ans.: Well, for quite a while you may not have any symptoms, any characteristic symptoms, that is, in the early stages, but usually the most prominent and most existent symptom is shortness of breath. Q. Usually associated with coughing? Ans.: Yes, sir." He was asked substantially the same hypothetical question that Dr. Gallant had answered, and testified: "I think that possibly the asbestosis was a contributory cause in his death. I realize too that such a person might easily die with pneumonia that didn't have asbestosis at all so that my opinion would be that probably the asbestosis was a contributory cause. (On cross-examination.) Q. Doctor, I believe you stated what asbestosis is and you have stated what the reaction of the lungs was to asbestosis, I wish you would explain that just a little more fully, the reaction of the lungs to asbestosis? Ans.: You mean description of the damage done by the dust? Q. Yes. Ans.: The dust fibers usually lodge in the bronchial and there they in some manner irritate the tissues as they also gain entrance to the surrounding tissues surrounding the bronchials and the air sacs and set up irritations which causes the development of this scar tissue we refer to. Q. And whenever these particles of dust get and set up this irritation causing fiber tissues that closes that particular portion of the lung, in other words, cuts off that portion of the lung, does it not? Ans.: Eventually."
Dr. G. W. Murphy, an X-ray expert, testified in part: "Q. Did you see an X-ray picture of this particular subject, Mr. Blassingame? Ans.: Yes, sir. Q. Doctor, what did you find in that picture with reference to any abnormalities of his lungs? Ans.: Well, he has a typical fibrosis in his lungs that we consider characteristic of an asbestosis. Q. Where is that fibrosis located, throughout the lungs or any particular part of them? Ans.: Largely confined to the lower half. Q. Both lungs. Ans.: Both lungs." To the hypothetical question, he answered that it did not play any appreciable part.
Dr. J. Donnelly, an expert, testified in part: "Q. From the reports of the films what did you conclude to the findings upon autopsy of the condition of the lungs? Ans.: I think he had an early asbestosis." To the hypothetical question he said: "Didn't play any part." The X-ray report is what he went by. On cross-examination: "Q. So the asbestosis in those cases where they died — in what cases then could asbestosis be a proximate cause of a disease causing the death of the patient? Ans.: Well, I don't know whether you'd call it a disease, most asbestotics die from a progressive heart failure on account of tremendous amount of fibrosis in the lungs."
Diagnosis: His lungs were examined by Dr. J. W. Miller, Pathologist, Laboratory of Industrial Hygiene, Office of Industrial Hygiene 
Sanitation, U.S. Public Health Service. His diagnosis was as follows: *Page 230 
"Pneumonia, lobar, right upper and middle lobes; Asbestosis, early," etc.
The hearing Commissioner found: "The deceased did not suffer an injury by accident arising out of and in the course of his employment resulting in his death. He did not suffer an occupational disease described in section 50 1/2 of the compensation law known as asbestosis that caused or had any connection with his death or the pneumonia from which he died," and award was denied. An appeal was taken to the Full Commission, which found: "The Full Commission, after a careful study of the evidence and opinion, orders that the Findings of Fact, Conclusions of Law and the award of the hearing Commissioner, wherein compensation was denied, be vacated and set aside and in lieu thereof the following Findings of Fact, Conclusions of Law and Award be substituted." The Full Commission carefully found many "Findings of Fact" and from the evidence made its "Conclusions of Law" and held, "Therefore, the Full Commission concludes as a matter of law, under section 50 1/2 of the compensation law, that this death case is compensable." An award was made for plaintiffs.
The defendants made numerous exceptions and assignments of error and appealed to the Superior Court. The court below rendered the following judgment: "This cause coming on to be heard at the October 16, 1939, Extra Term of the Superior Court for Mecklenburg County, and being heard before his Honor, A. Hall Johnston, upon appeal by defendants from the North Carolina Industrial Commission, and the exceptions to the findings of fact, conclusions of law and award of the Commission, after hearing argument of counsel for plaintiffs and defendants, the court overrules the exceptions of the defendants and affirms the findings of fact, conclusions of law, and award of the North Carolina Industrial Commission. This 21st day of October, 1939. A. Hall Johnston, Judge Presiding."
The defendants excepted and assigned error to the judgment as signed and appealed to the Supreme Court. The exception and assignment of error, and other necessary facts for the determination of this cause, will be set forth in the record.
We do not think that the exception and assignment of error made by defendants to the judgment, as signed by the court below, can be sustained. Asbestosis cases have been before this Court heretofore. McNeeley v.Asbestos Co., 206 N.C. 568 (1934); Swink v. Asbestos Co., 210 N.C. 303. These cases were prior to the amendment of 1935. *Page 231 
The General Assembly of North Carolina, at its regular session of 1935, passed a comprehensive act (chapter 123) in reference to occupational diseases, amending the Workmen's Compensation Act, Public Laws 1929, chapter 120, "And to provide for securing the payment of compensation in certain cases of occupational disease." The pertinent parts — chapter 123. . . . Sec. 50 1/2. (a) The disablement or death of an employee resulting from an occupational disease described in paragraph (b) of this section shall be treated as the happening of an injury by accident within the meaning of the North Carolina Workmen's Compensation Act and the procedure and practice and compensation and other benefits provided by said act shall apply in all such cases except as hereinafter otherwise provided. The word `accident,' as used in the Workmen's Compensation Act, shall not be construed to mean a series of events in employment, of a similar or like nature, occurring regularly, continuously or at frequent intervals in the course of such employment, over extended periods of time, whether such events may or may not be attributable to fault of the employer, and disease attributable to such causes shall be compensable only if culminating in an occupational disease mentioned in and compensable under this act: Provided, however, no compensation shall be payable for asbestosis and/or silicosis as hereinafter defined if the employee, at the time of entering into the employment of the employer by whom compensation would otherwise be payable, falsely represented himself in writing as not having previously been disabled or laid off because of asbestosis or silicosis. (b) The following diseases and conditions only shall be deemed to be occupational diseases within the meaning of this act: . . . (24) Asbestosis. (25) Silicosis. . . . (c) The term `disablement' as used in this section as applied to cases of asbestosis and silicosis means the event of becoming actually incapacitated, because of such occupational diseases, from performing normal labor in the last occupation in which remuneratively employed,'" etc. The act provided money through the Industrial Commission for medical and engineering studies, examinations, etc. The United States Public Health Service supplemented these funds through the North Carolina State Board of Health. As a result the Division of Industrial Hygiene was established in North Carolina.
The act also provides for "Advisory Medical Committee": "`(m) Except as herein otherwise provided, in case of disablement or death from silicosis and/or asbestosis, compensation shall be payable in accordance with the provisions of the North Carolina Workmen's Compensation Act.' . . . `(o) Unless written notice of the first distinct manifestation of an occupational disease shall be given to the employer in whose employment the employee was last injuriously exposed to the hazards of such disease or to the Industrial Commission within thirty *Page 232 
(30) days after such manifestation, and, in case of death, unless also written notice of such death shall be given by the beneficiary hereunder to the employer of the Industrial Commission within ninety (90) days after occurrence, and unless claim for disability and/or death shall be made within one (1) year after the disablement or death, respectively, all rights to compensation for disability or death from an occupational disease shall be forever barred,'" etc.
The Commission set forth "The deceased had been employed in the asbestos industry in North Carolina almost continuously since 1925. For some time before his death and during his last illness he had all the characteristic symptoms of a true asbestosis, but no doctor had so diagnosed it and told him; therefore, the deceased did not have a `distinct manifestation' as provided for in section 50 1/2 (o). The Commission has held in several cases against the Standard Mineral Company that the `first distinct manifestation' is when the employee is told by competent medical doctors that he has asbestosis or silicosis. No claim for compensation could be filed until there was a diagnosis of asbestosis. The first diagnosis of asbestosis was the autopsy report."
The Commission found: "That Dr. Easom's X-ray diagnosis, based upon two examinations, January 27, 1936, and March 23, 1937, was first degree ground glass appearance and asbestosis of both lower lung fields."
The Commission found: "That the widow first knew that her husband, W. S. Blassingame, had asbestosis some time after the autopsy report was filed, May 10, 1937; that notice and claim for compensation were made out July 19, 1937, and filed both with the defendant employer and the Industrial Commission July 20, 1937, or within 90 days as required in section 50 1/2 (o)." The Occupational Disease Act, including "asbestosis," was passed in 1935 — chapter 123. It was an act to amend the Workmen's Compensation Act (chapter 120, Laws 1929). This act says that "All laws and clauses of laws in conflict herewith are hereby repealed." Therefore, the Occupational Disease Act must be construed in pari materia.
In Real Estate Co. v. Sasser, 179 N.C. 497 (499), it is said: "Amendments are to be construed together with the original act, to which they relate, as constituting one law. The old law should be considered, the evils arising under it, and the remedy provided by the amendments adopted, which shall best repress the evils and advance the remedy. 36 Cyc., 1164, and cases cited." S. v. Kelly, 186 N.C. 365 (372).
The following provisions were then in existence, in which there is no conflict: Section 8081 (dd), in part: "Every injured employee or his representative shall immediately on the occurrence of an accident, or as soon thereafter as practicable, give or cause to be given to the employer a written notice of the accident. . . . Unless it can be shown that *Page 233 
the employer, his agent or representative, has knowledge of the accident, or that the party required to give such notice had been prevented from doing so by reason of physical or mental incapacity, or the fraud or deceit of some third person; but no compensation shall be payable unless such written notice is given within thirty days after the occurrence of the accident or death, unless reasonable excuse is made to the satisfaction of the Industrial Commission for not giving such notice and the Commission is satisfied that the employer has not been prejudiced thereby."
Section 8081 (ff): (a) The right to compensation under this article shall be forever barred unless a claim be filed with the Industrial Commission within one year after the accident, and if death results from one accident, unless a claim be filed with the Commission within one year thereafter." This section, like the amendment of 1935, says, similar to the old act, "shall be forever barred."
The claim was filed within two weeks after date of letter of Dr. Easom transmitting his report, and the autopsy report of the United States Public Health Service to Dr. Stewart, of Lithonia, Ga. The Commission has found that the widow first knew that her husband had asbestosis some time after 10 May, 1937, which was the date of the autopsy report of the United States Public Health Service; that notice and claim was made 19 July, 1937, and filed 20 July, 1937. Thus it will be seen that it was humanly impossible for the widow to have given notice of such death (death resulting from asbestosis) within ninety days after the death. To construe this section as contended by the defendants would be to deny the benefits conferred by the act in this and all similar cases. The context of the Compensation Act does not favor such a strained or technical construction. The cause of deceased's death could only be ascertained by autopsy, as above set forth, and notice was given within ninety (90) days after discovery and action brought within one (1) year.
In Johnson v. Hosiery Co., 199 N.C. 38 (40), this Court said: "It is generally held by the courts that the various Compensation Acts of the Union should be liberally construed to the end that the benefits thereof should not be denied upon technical, narrow, and strict interpretation." We see nothing prejudicial to defendants.
In II Schneider, Workmen's Compensation Law (2nd Ed.), part sec. 554, at pp. 2002-3, we find: "`The courts may not interfere with the findings of fact, made by the Industrial Commissioner, when these are supported by evidence, even though it may be thought there be error.' `The rule . . . is well settled to the effect that, if in any reasonable view of the evidence it will support, either directly or indirectly, or by fair inference, the findings made by the Commission, then they must be regarded as conclusive' (citing a wealth of authorities). Courts cannot *Page 234 
demand the same precision in the finding of Commission as otherwise might be if the members were required to be learned in the law."
In IV Schneider, Workmen's Compensation Law (supplement), page 592, it is said: "`Undoubtedly, if any party feels that the Commission's findings of fact are not clear, leave the reason for its conclusion and award in doubt, or should be amplified for any other reason, he should ask the Commission to modify them by making additional findings instead of complaining in the appellate court that findings of fact, which are not inconsistent with the result reached, do not contain a finding concerning all disputed questions of fact which must necessarily have been decided in order to make and support the award.' State ex rel. Probst v. Haid (Mo.),62 S.W.2d 869 (August, 1933), quashing certiorari (App.), 52 S.W.2d 501."
There is no evidence that the Commission found that the lack of the notice was prejudicial to the employer. The statute does not provide that the notice to the employer is a condition precedent (Wilson v. Clement Co.,207 N.C. 541), but it does provide that the claim, if not made within one year by the claimant, "shall be forever barred." This provision does not apply to the 90 days, and from a reasonable construction of the statute it seems to have been intentionally omitted. The Commission found that the widow filed the notice "within 90 days" as required by sec. 50 1/2 (o),supra. If the widow is barred, what about the minor? Taking the intent of the statute, that under the facts and circumstances of this case it was never contemplated that the widow should make claim without being able to make a truthful one, and this was an impossibility until after the autopsy. By analogy see Nelson v. Ins. Co., 199 N.C. 443.
In S. v. Humphries, 210 N.C. 406 (410), Devin, J., for the Court says: "The object of all interpretation is to determine the intent of the lawmaking body. Intent is the spirit which gives life to a legislative enactment. The heart of a statute is the intention of the lawmaking body.Trust Co. v. Hood, Comr., 206 N.C. 268; S. v. Earnhardt, 170 N.C. 725. In the language of Chancellor Kent: `In the exposition of a statute the intention of the lawmaker will prevail over the literal sense of the terms and its reason and intention will prevail over the strict letter. When the words are not explicit, the intention is to be collected from the context, from the occasion and necessity of the law, from the mischief felt and the remedy in view, and the intention is to be taken or presumed according to what is consonant with reason and good discretion.' 1 Kent Com., 461."
In Cooley Blackstone, Intro. sec. 2, page 53, we find: "Intent as expressed. The fairest and most rational method to interpret the will of the legislator is by exploring his intention at the time when the law *Page 235 
was made, by signs the most natural and probable. And these signs are either the words, the context, the subject matter, the effects and consequences, or the spirit and reason of the law. . . . (p. 54) As to theeffects and consequences, the rule is, that where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them. Therefore the Bolognian law, mentioned by Puffendorf, which enacted `that whoever drew blood in the streets should be punished with the utmost severity,' was held after long debate not to extend to the surgeon, who opened the vein of a person that fell down in the street with a fit."
The Industrial Commission found, among other facts, the following: "That the immediate cause of the death of the deceased was pneumonia superimposed upon asbestosis; that the degree of asbestosis with which the deceased was suffering prior to contracting pneumonia had the effect of lowering his resistance to the pneumonia germ which, according to medical science, is ever present in the human body; that the general condition of the deceased produced by such lowered resistance or inability to ward off pneumonia was the inciting or proximate cause of the fatal development of pneumonia and death of the deceased was proximately caused by the condition of the deceased which was produced and brought about by a weakened condition and lowered resistance due to asbestosis with which the deceased was and had been suffering for some time prior to the time he was stricken with pneumonia. . . . That the widow first knew that her husband, W. S. Blassingame, had asbestosis some time after the autopsy report was filed May 10, 1937; that notice and claim for compensation were made out July 19, 1937, and filed both with the defendant employer and the Industrial Commission on July 20, 1937, or within 90 days, as required by section 50 1/2 (o); that the deceased never knew he had asbestosis."
The only exception and assignment of error made by the defendants is to "the judgment as signed."
In Lassiter v. Telephone Co., 215 N.C. 227 (230), it is said: "It is established in this jurisdiction that the findings of fact made by the Industrial Commission, if supported by competent evidence, are conclusive on appeal and not subject to review by the Superior Court or this Court, although this Court may have reached a different conclusion if it had been the fact finding body."
In Tindall v. Furniture Co., 216 N.C. 306 (310), it is written: "And the application of the rule of the conclusiveness of the findings of the Industrial Commission as to controverted issues of fact, when based on competent evidence, is not defeated by the fact that some of the testimony offered may be objectionable under the technical rules of evidence appertaining to courts of general jurisdiction, as pointed out in Maley *Page 236 v. Furniture Co., 214 N.C. 589, and Consolidated Edison Co. v. NationalLabor Relations Board, 305 U.S. 197." There was circumstantial evidence.
The hypothetical question we think proper under our decisions. A similar hypothetical question was admitted in Shaw v. Handle Co., 188 N.C. 222
(tried before Devin, J.), and approved by this Court. In that case the question was the cause of the death of two men in the cabin of a boat. It was alleged that the boat was operated by a gasoline engine which was old, worn out and defective and would blow gas fumes out of the engine into the cabin. The weather was cold and the windows closed. The hypothetical question was answered: "Gas poisoning, monoxide poisoning" (carbon monoxide gas). Cabe v. Parker-Graham-Sexton, Inc., 202 N.C. 176; Keith v. Gregg,210 N.C. 802 (807). In this case we think the hypothetical questions assume facts which the evidence directly, fairly and reasonably tends to establish, and were competent. The probative force was for the Commission.
The facts were fully sufficient to justify the Industrial Commission's finding of fact that the proximate cause of death was asbestosis. The facts are distressing — a young man, a bread-winner with a wife and child, in the performance of his duty to his employer, in an industry fraught with danger, was weakened by the inhaling of asbestos dust, and died from its effects. His lungs were practically closed by "ground glass appearance."
None of the contentions of the defendants can be sustained. There was sufficient competent evidence for the Commission to find the facts upon which they found defendants' liable. It has been said repeatedly by us that the findings of fact are binding on us.
We see no error in law. The judgment of the court below is
Affirmed.