MRS. ELSIE PEARL DUNCAN (OR MRS. MARVIN WASHINGTON DUNCAN), WIDOW OF MARVIN W. DUNCAN, DECEASED, EMPLOYEE, v. CITY OF CHARLOTTE, SELF-INSURER, CHARLOTTE, NORTH CAROLINA.

(Filed 17 July, 1951.)

**1. Master and Servant § 40e—**

The rule that there must be a causal relation between the employment and the injury in order for the injury to be compensable under the Workmen's Compensation Act is fundamental and necessary to effectuate the intent of the Act to provide benefits for industrial injuries rather than to set up general health insurance benefits.

**2. Master and Servant § 40f—**

The 1935 Amendment to the Workmen's Compensation Act which provides for compensation for occupational diseases does not obviate the necessity of claimant showing that the disease resulted from the employment. Indeed, the definition of an occupational disease is one which is the natural result of the particular employment.

**3. Same—**

Heart disease is not ordinarily considered either an occupational disease or as one arising out of and in the course of the employment, and recovery therefor must be based upon evidence that it resulted from some unusual exertion or strain undergone in the discharge of the duties of the employment. G.S. 97-2 (f).

**4. Same: Constitutional Law § 17—**

Ch. 1078, Session Laws of 1949 (G.S. 97-53 (26)), which provides that as to active firemen of cities and towns of the State heart disease is an occupational disease *per se* and thus dispenses with the necessity of proof of a causal connection between heart disease and the employment, *is held* unconstitutional as providing separate and exclusive emoluments or privileges to the group specified not accorded to other municipal employees or to employees in private industry, in controvention of Art. I, sec. 7, of the State Constitution.

APPEAL by defendant from *Bennett, Special Judge,* at 8 January Extra Civil Term, 1951, of MECKLENBURG.

Proceeding under Workmen's Compensation Act for compensation claimed by the widow of Marvin W. Duncan, deceased, who was a member of the fire department of the City of Charlotte, self-insurer. The deceased died 25 September, 1949, as a result of coronary occlusion while on annual vacation at the home of a relative near Quakertown, Pennsylvania. The Commission made an award under the provisions of the 1949 amendment to the Act (Chapter 1078, Session Laws of 1949, now codified as G.S. 97-53 (26)), which provides that certain classified heart diseases, including coronary occlusion, shall be deemed and treated as compensable occupational diseases as to active members of city fire departments. The pertinent parts of the 1949 amendment are as follows:

"In case of members of fire departments of cities, counties or municipal corporations or political subdivisions of the State, whether such members are voluntary, partly paid or fully paid, coronary thrombosis, coronary occlusion, angina-pectoris or acute coronary insufficiency shall each be deemed to be an occupational disease within the meaning of this Article, provided:" (Here follow certain limitations as to length of the employment, and so forth, which do not materially affect the instant case.)

The evidence discloses these facts: Marvin W. Duncan, plaintiff's intestate, at the time of his death was captain of an engine company of the fire department of the City of Charlotte. He was forty-eight years

of age, five feet eight and one-half inches in height, and weighed approximately two hundred ten pounds. He had been employed by the fire department since 20 January, 1923. Later that year he underwent a physical examination which failed to disclose the presence of heart disease. The deceased, with the consent of his superior officer, began a two-weeks vacation with pay on 16 September, 1949. That day the deceased, with his wife and two friends, left Charlotte by automobile on a vacation trip that was to take them into the New England States, with the deceased doing most of the driving. The first day the party made five hundred miles, with a short stop at Gettysburg, and were tired when they went to bed. The second day they by-passed New York, made a short stop at Hyde Park, and spent the night in Springfield, Massachusetts, where again they went to bed tired. The next day they visited a friend in Worcester, Massachusetts, and drove on to Boston, arriving there before dark. They stored the automobile and spent the next day in sight-seeing around Boston in public conveyances. In the evening they attended a show and went to bed about midnight. The next day the deceased visited a fire station and in the afternoon went to a ball game; after supper the party again went to the theatre, and to bed about midnight. The next morning they toured Boston and vicinity in their automobile, with a friend driving, and after lunch started for New York City, eating supper in New Haven and arriving in New York about 10 :40 o'clock that night. They went to bed about midnight. The next morning the deceased visited with another fireman, saw Radio City Music Hall in the afternoon, went to the theatre that night, and again went to bed about midnight. The next two days and nights were spent in New York City under a routine of activity similar to that of the first day. Each night the deceased went to bed about midnight. The party left New York about noon 25 September, to visit a cousin in Quakertown, Pennsylvania. They arrived there about 4 :40 o'clock in the afternoon. During the last fourteen miles of the trip the deceased complained of gas pains, and immediately on arriving tried unsuccessfully to relieve himself by taking a dose of soda. His pains grew worse. Dr. W. F. Ort was called and came immediately, arriving about 5 :04 o'clock. The deceased went into convulsions and died a few minutes later. All of the medical experts pronounced the cause of death as coronary occlusion.

The deceased had suffered "dizzy spells" in 1947, after which he was checked by a physician and "given a clean bill of health." Again in February, 1949, he suffered "dizzy spells," after which he underwent a complete physical examination by Dr. C. L. Stuckey, who stated that he found "no cardio-vascular symptoms." Dr. Stuckey said it was his "impression that the patient was in excellent general health" except for

"prostatic" and "appendix" conditions which cleared under treatment and "when seen three weeks later . . . he felt entirely well."

The evidence further shows that the deceased had been attached to one of the more active fire stations in the City of Charlotte for about nine years; that his company was on alternate day and night shifts; that when on night duty he and his men would dress and clear the station in less than a minute after an alarm; that his duties involved handling of hose and other equipment, climbing ladders, fighting fires in basements, attics, roofs, and wherever there was fire and smoke.

The medical testimony, mainly that of Dr. R. L. McMillan, an expert in cardio-vascular medicine, discloses that coronary thrombosis is a blood clot that forms in a coronary artery. Dr. McMillan stated that "The symptoms may be anything from no symptoms at all up to the severest symptoms, which are severe pains in the chest, generally located in the midline of the chest and center portion and spreading into one or both shoulders, and frequently into the jaws, and associated often with nausea and vomiting. Commonly, there is cold sweating, and of course it is well known for it to terminate in one minute and in death, or it may go on to recovery. The pain usually continues anywhere from two to twenty-four hours, and commonly requires a strong sedative for relief. The clot occurs in one or more of the coronary arteries that feed the heart. A coronary occlusion is synonymous with coronary thrombosis. If a thrombosis occurs, the vessels will be occluded and that would be an occlusion."

Dr. McMillan further stated that "Angina pectoris is actually a symptom complexion which occurs as a result of an inadequate amount of blood flowing through the coronary vessels into the heart muscles, or it may be brought on by some other factors, such as a reduced oxygen intake through the lungs or very low blood sugar. Angina pectoris is generally produced by exertion and manifests itself by pain which is milder as a rule than the pain of coronary thrombosis and which is of temporary duration rather than of long duration. Angina pectoris is relieved by rest or certain drugs, such as nitroglycerine. Acute coronary insufficiency embodies both of the conditions of thrombosis or angina pectoris. The pain in both thrombosis and angina pectoris comes on suddenly as a rule. Coronary thrombosis, coronary occlusion, angina pectoris and acute coronary thrombosis are in a general classification in that they are all coronary artery diseases, but they are of a different nature and of a difference significance. Arteriosclerosis would not embrace all of these diseases, this lesion is present when these disorders occur. Arteriosclerosis in lay terms means a hardening or thickening of the walls of the arteries. The hardening and thickening of the walls of the arteries would be likened to a pipe used to transport a liquid, the smaller the lumen, the less blood could flow through the vessels without a great increase in pressure."

Dr. McMillan further stated in effect that a person suffering from coronary thrombosis, coronary occlusion, angina pectoris, or acute coronary insufficiency would not be capable of prolonged physical effort; that sudden physical exertion by a person suffering from one of the four types of heart diseases would produce pain in the chest; that if the person already had a coronary thrombosis sudden exertion might dilate the heart to the point where the person would have heart failure and expire; that tension is a contributing factor toward the development of these diseases; that the greater stress and strain an individual is under the earlier in life he will develop coronary artery diseases.

Dr. McMillan further stated that a heart may become dilated for any number of reasons, and gave as his opinion that Marvin W. Duncan died of coronary occlusion. However, he further stated that he had no opinion as to whether or not the heart attack of plaintiff's intestate was brought about by his employment as a fireman, and the record contains no testimony tending to show that the deceased's heart attack was caused by his employment as a fireman.

However, the Commission, applying the 1949 amendment, found and concluded that the duties of the deceased as a fireman, performed by him over a long period of time, subjected him "to unusual exertion, strain, and emotion; that the coronary occlusion from which (he) died is a direct result of, and bears a causal connection with, the hazards of his employment as a fireman . . . and (that) he died on 25 September, 1949, under circumstances which amount to death by accident arising out of and in connection with his employment within the meaning of the 1949 amendment.

The defendant, pursuing its challenge to the constitutional validity of the 1949 amendment under which the award was made, appealed to the Superior Court. There the award was affirmed.

The defendant excepted and appealed to this Court.

*Henry E. Fisher, Taliaferro, Clarkson & Grier, and J. C. B. Ehringhaus, Jr., for plaintiff, appellee.*
*John D. Shaw for defendant, appellant.*

JOHNSON, J. Since the enactment of the Workmen's Compensation Act in 1929, no rule has proved more essential to its sound and orderly administration than the one which requires that an injury to be compensable must be shown to have resulted from an accident arising out of and in the course of the employment. *Brown v. Aluminum Co.,* 224 N.C. 766, 32 S.E. 2d 320; *Wilson v. Mooresville,* 222 N.C. 283, 22 S.E. 2d 907; *Neely v. Statesville,* 212 N.C. 365, 193 S.E. 664; and *Rewis v. Ins. Co.,* 226 N.C. 325, 38 S.E. 2d 97; G.S. 97-2 (f). This principle has

come to be known and referred to as the rule of causal relation, *i.e.*, that injury to be compensable must spring from the employment. *Plemmons v. White's Service, Inc.*, 213 N.C. 148, 195 S.E. 370; *Bolling v. Belk-White Co.*, 228 N.C. 749, 46 S.E. 2d 838. This rule of causal relation is the very sheet anchor of the Workmen's Compensation Act. It has kept the Act within the limits of its intended scope,—that of providing compensation benefits for industrial injuries, rather than branching out into the field of general health insurance benefits. *Vause v. Equipment Co.*, 233 N.C. 88, 63 S.E. 2d 173; *Conrad v. Foundry Co.*, 198 N.C. 723, 153 S.E. 266.

True, the General Assembly by amendment in 1935 (following the decision of this Court in *McNeely v. Asbestos Co.*, 206 N.C. 568, 174 S.E. 509), extended the scope of the Act by including a specified list of twenty-five occupational diseases which are the usual and natural incidents of particular types of employment. Chapter 123, Public Laws of 1935, now codified as G.S. 97-52 and G.S. 97-53.

The amendment of 1935, however, in nowise relaxed the fundamental principle which requires proof of causal relation between injury and employment. And nonetheless, since the adoption of the amendment, may an award for an occupational disease be sanctioned unless it be shown that the disease was incident to or the result of the particular employment in which the workman was engaged. *Tindall v. Furniture Co.*, 216 N.C. 306, 4 S.E. 2d 894; *Blassingame v. Asbestos Co.*, 217 N.C. 223, 7 S.E. 2d 478.

Aside from statutory definitions, an occupational disease has a well-defined meaning. Before the adoption of the 1935 amendment, this Court in *McNeely v. Asbestos Co., supra* (206 N.C. 568, at p. 572), defined an occupational disease as follows:

"A disease contracted in the usual and ordinary course of events, which from the common experience of humanity is known to be incidental to a particular employment, is an occupational disease, . . ."

"An 'occupational disease' suffered by a servant or employee, if it means anything as distinguished from a disease caused or superinduced by an actionable wrong or injury, is neither more nor less than a disease which is the usual incident or result of the particular employment in which the workman is engaged, as distinguished from one which is caused or brought about by the employer's failure in his duty to furnish him a safe place to work."

If a disease is not a natural result of a particular employment, but is produced by some extrinsic or independent agency, it is in no real sense an occupational disease, and ordinarily may not be imputed to the occupation or employment. 58 Am. Jur., Workmen's Compensation, Section

246, p. 748. See also Schneider, Workmen's Compensation, Third Edition, Text Vol. 3, Sec. 502 *et seq.*

The record in the instant case reflects no evidence that the fatal heart attack suffered by the deceased was in fact an occupational disease or that it was produced by his employment as a fireman. And ordinarily, a heart disease is not deemed an "injury by accident arising out of and in the course of the employment" (G.S. 97-2 (f); *Neely v. Statesville, supra),* nor an occupational disease. *West v. Dept. of Conservation,* 229 N.C. 232, 49 S.E. 2d 398. See also *Industrial Commission v. Betleyoun,* 31 Ohio A. 430, 166 N.E. 380.

It is significant that claimant's principal witness, Dr. McMillan, in reply to a direct question, said he had no opinion as to whether or not the heart attack was brought on by deceased's employment as a fireman. And the award below is unsupported by evidence showing causal relation between the fatal disease and the employment out of which it supposedly arose.

Nor does the evidence bring the case within the principle applied in *Gabriel v. Newton,* 227 N.C. 314, 42 S.E. 2d 96, where an unusual exertion strained and stretched the muscles of the heart and blood vessels, causing acute dilation of the heart, which was deemed a compensable injury on the theory of accident.

Here, however, the claimant insists that the award may be sustained under the 1949 amendment (Chapter 1078, Session Laws of 1949, now codified as G.S. 97-53 (26)), which designates certain heart diseases as occupational diseases as to firemen. This amendment singles out active members of fire departments of cities, towns, and other political subdivisions of the State, and as to such firemen makes each of certain classified heart diseases an occupational disease *per se,* and by legislative fiat dispenses with the necessity of proving causal relation between the heart disease and the employment.

The defendant challenges the constitutional validity of the 1949 amendment on the ground that it provides in effect for a gift or gratuity from the public treasury in direct violation of Article I, Section 7, of the Constitution of North Carolina, which provides that:

"No man or set of men are entitled to exclusive or separate emoluments or privileges from the community but in consideration of public services."

The defendant's challenge is well taken. In reality, the statute seeks to confer upon firemen a special privilege not accorded other municipal employees, nor to employees in private industry. It places on the taxpayers a burden which the Constitution declares it was not intended for them to bear. It creates for firemen substantial financial benefits, to be paid from the public treasury under the guise of workmen's compensation benefits, without establishing an occupational disease as the usual incident

or result of the particular employment. Any such payment is in direct conflict with the foregoing constitutional prohibition against separate emoluments and special privileges, and the Legislature has no power to authorize a municipal corporation to pay any such gratuity to a particular class of its employees. Our decision here is in accord with a long line of previous decisions of this Court reflecting a consistent interpretation of this constitutional limitation in striking down legislative grants of separate emoluments and special privileges. *Simonton v. Lanier,* 71 N.C. 498; *Motley v. Warehouse Co.,* 122 N.C. 347, 30 S.E. 3 (petition for rehearing denied, 124 N.C. 232, 32 S.E. 555); *S. v. Fowler,* 193 N.C. 290, 136 S.E. 709; *Plott v. Ferguson,* 202 N.C. 446, 163 S.E. 688; *Edgerton v. Hood, Comr. of Banks,* 205 N.C. 816, 172 S.E. 481; *S. v. Sasseen,* 206 N.C. 644, 175 S.E. 142; *Brown v. Comrs. of Richmond County,* 223 N.C. 744, 28 S.E. 2d 104. See also: *Cowan v. Trust Co.,* 211 N.C. 18, 188 S.E. 812; *S. v. Warren,* 211 N.C. 75, 189 S.E. 108; *S. v. Harris,* 216 N.C. 746, 6 S.E. 2d 854.

In *Simonton v. Lanier, supra,* it was contended that the charter of the Bank of Statesville, incorporated by private-local act of the Legislature, was given the special privilege to lend money at a rate of interest in excess of that allowed by general state law. There the Court held that the charter of the bank created no such special privilege. *Bynum, J.,* delivering the opinion, in referring to Article I, Sections 7 and 31, of the Constitution of North Carolina, said: "The wisdom and foresight of our ancestors is nowhere more clearly shown than in providing these fundamental safeguards against partial and class legislation, the insidious and ever-working foes of free and equal government." (71 N.C. mid. p. 503.)

*S. v. Fowler, supra,* involves a conflict between the provisions of a general and a public-local statute. There, under the general statute a violation of the state prohibition law was made punishable by fine and imprisonment within the discretion of the court; whereas the public-local act, applying to only five counties, restricted the punishment to a fine in certain instances. It was held that the public-local act attempted to confer upon residents of the five counties privileges or immunities not enjoyed by other residents of the State in violation of Article I, Section 7, of the State Constitution. In a well considered opinion by *Adams, J.,* it is stated that the public-local act grants "a special exemption from punishment or an exclusive or separate privilege which is forbidden by the cited provision. . . . It follows that the provision limiting the punishment for the first offense to a fine must be regarded as an arbitrary class distinction which cannot be sustained because forbidden by the fundamental law . . ." (193 N.C. at pp. 293 and 294.)

In *Edgerton v. Hood, Comr. of Banks, supra,* a public-local statute provided that deposit claims of certain closed banks might be sold to

persons indebted to such banks on the date of closing, and that any such purchased claim might be set off against a debt owed by the purchaser to the same closed bank. *Connor, J.,* speaking for the Court, said: "The statute contravenes this sound and just principle, and violates both the letter and spirit of the provision, because (1) it attempts to confer an exclusive and separate privilege on one class of creditors and debtors of a closed bank, which it denies to another class, with no just or reasonable ground for the classification; . . ." (205 N.C. bot. p. 821.)

In *S. v. Sasseen, supra,* an ordinance of the City of Charlotte required operators of for-hire motor vehicles within the city to post policies of liability insurance written by responsible companies authorized to do business in the State of North Carolina. The ordinance was held void as class legislation, violative of Article I, Sections 7 and 31, of the State Constitution, in that it failed to provide that the security required might be furnished by solvent individual sureties as well as corporate ones. (206 N.C. 644.)

In *Brown v. Comrs. of Richmond County, supra,* a local recorder's court was abolished by act of the General Assembly before expiration of the term to which the presiding judge had been elected. Thereafter a special county court was organized under general statute, with another person being appointed judge. Later an act of the Legislature directed that the county pay the judge of the abolished court his salary for the unexpired term. It was held that the statute was violative of Article I, Section 7, of the State Constitution. In a well considered opinion written by *Justice Barnhill* it is stated (referring to Article I, Section 7, of the Constitution): "This constitutes a specific constitutional prohibition against gifts of public money, and the Legislature has no power to compel or even to authorize a municipal corporation to pay a gratuity to an individual to adjust a claim which the municipality is under no legal obligation to pay (citation of authorities). Nor may it lawfully authorize a municipal corporation to pay gifts or gratuities out of public funds. . . ." (223 N.C. p. 746.)

It follows that Chapter 1078, Session Laws of 1949, is repugnant to Article I, Section 7, of the Constitution of North Carolina. Therefore the statute is declared invalid and inoperative, and the award below being unsupported by the requisite proof of causal relation between the deceased's employment and his death (*Plemmons v. White's Service, Inc., supra* (213 N.C. 148), the judgment below is

Reversed.