* * * *
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Ledford with modifications.
 * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. On and prior to May 12, 2004, an employment relationship existed between plaintiff William Glenn and defendant TDM Corporation.
3. On and prior to May 12, 2004, TDM Corporation was insured for claims arising out of the Workers Compensation Act by The Hartford.
4. Plaintiff's average weekly wage is to be determined.
5. The issues before the Deputy Commissioner were:
 (a) Whether plaintiff contracted an occupational disease, namely silicosis as a result of his employment at TDM; and
 (b) If so, to what benefits is plaintiff entitled?
 * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 44 years of age, born February 23, 1963. He graduated from high school and thereafter entered the work force. His prior work history includes installation of air conditioning units and employment as a machinist.
2. Prior to working for the defendant, plaintiff worked for a company called Norton from approximately 1984 through 1988, where he performed the same job functions as a machinist that he later performed for defendant. In addition to milled metal parts, Norton also produced silicone abrasives in the same enclosed facility where plaintiff worked.
3. Defendant operates a 36,000 square foot custom machine shop in Fletcher, North Carolina, where products of various metal compositions are machined to meet specifications of defendant's customers. The employees use machinery to mill formed metal pieces into precision *Page 3 
parts to be fit onto larger structures. Parts generally machined by defendant consist of various steels, i.e. hard steel, tool steel and cold roll steel, as well as a variety of cast metal products, including cast iron, cast ductile iron, cast aluminum and cast steel. Cast metal parts delivered to defendant's plant are produced or manufactured at various foundries by pouring molten metal into sand and clay casts. Defendant does no casting at its Fletcher facility.
4. Before delivering the cast metal pieces to defendant, the foundries eradicate from the metal pieces the traces of sand left over from the casting process by first shaking out the sand and then shot-paening the pieces with "B-B's". The foundries also paint the surfaces of most pieces before delivering them to defendant to keep the pieces from rusting in storage or transit. Per the testimony of Mr. Ramsey, sand debris left on the metal parts to be machined by defendant would damage the milling machinery.
5. There is no sand used in defendant's production process other than a small, self-contained sandblasting cubicle outside the facility. Plaintiff was not assigned to the sandblasting machine, and did not use it. While Mr. Ramsey admitted that the facility could be dusty, he denied that the dust was from sand or silica dust, and there was no evidence that silica dust was suspended in the air or collected on the floor at defendant's facility. The photographs of the machines and the production process do not indicate any appreciable amount of dust in the air or on surfaces. There is no direct evidence of the existence of silica, respirable or otherwise, at the Fletcher facility. The byproduct of defendant's milling process is primarily metal shavings too big to be respirable which tend to pile up around the milling machines.
6. Plaintiff would not stipulate to the admission into evidence of the results of a 1998 OSHA air quality test. However, the evidence establishes that OSHA has never cited *Page 4 
defendant for unacceptable levels of any substance in the air, including silica or heavy metals, at the Fletcher facility.
7. During the deposition of Dr. Cross, defendants identified and attached as an exhibit an industrial hygiene report from VATC Associates, Inc. dated July 6, 2004, which concerned air quality samples taken from defendant's Fletcher facility on June 21, 2004. The test samples showed minute levels of heavy metals including beryllium, chromium, and iron, well below OSHA standards. There is no evidence that defendant's plant poses a risk of exposure to such heavy metals. There is no indication that environmental air quality at defendant's Fletcher facility has changed since plaintiff began his employment in 1991. There has been no reported case of any work related lung disease arising from the Fletcher facility since defendant was founded in 1969.
8. Plaintiff worked as a machinist, milling metal pieces for defendant between August 26, 1991, and May 12, 2004. Plaintiff mainly worked with cast metals on a horizontal boring machine called a "Woton" and used the Woton to bore, drill, tap, and cut the metal pieces and remove from the pieces what plaintiff called "stock," or the paint in which the pieces are delivered to defendant.
9. Defendant has in operation enclosed milling machines, as well as older open milling machines. The enclosed machines are surrounded by four walls, inside of which the machining processes are performed. While grinding the surface of a part on an enclosed machine, the operator stands outside of the enclosure, thereby removed from any dust, vapors or fumes created during the machining process. An employee grinding the surface of a metal part on an open machine is not walled-off from the spewings of the milling process. Plaintiff *Page 5 
primarily operated open machines, and in particular the Wonton machine, machining cast metal parts, particularly cast iron and cast ductile iron.
10. Plaintiff testified that the milling and boring he performed on the Woton machine created "refractory" dust that was visible in the air and which collected on his hands and on the brim of his cap. While plaintiff testified that he regularly blew "black stuff" out of his nose after work, he could not say whether he ever coughed up any of the dust to which he was allegedly exposed. No MSD (material safety data) sheets were submitted as evidence of what byproducts may be generated by the milling process of various metals.
11. Plaintiff never used a dust mask, respirator, or other ventilation device while milling metals for defendant. Mr. Ramsey's testimony shows that it is the "industry standard" to use a coolant solution in the machining process, as it preserves and protects the tools. Although the Woton machine on which plaintiff worked employed liquid coolant to decrease the friction caused by the boring, drilling, and tapping, plaintiff did not use the coolant, because he said it was a "mess" to clean up and he could mill the cast iron either wet or dry.
12. The first indication in the stipulated medical records of difficulties with plaintiff's lungs is a medical record generated by Dr. Daniel Veazy on July 29, 1991, which indicates that plaintiff was coughing up green/yellow material and some blood over the weekend. An x-ray of plaintiff's chest was considered on that occasion but not taken.
13. Plaintiff was hospitalized in the Spring of 1995 for severe pneumonia and esophagitis. As of March 13, 1995, Dr. Darilyn Dealy had diagnosed plaintiff with "infiltrates" resulting from viral pneumonia or aspiration. X-rays taken on March 11 and March 15, 1995 both indicated "bilateral patchy air-space disease predominantly in the upper lobes and mid portions" of plaintiff's lungs. *Page 6 
14. Plaintiff complained to Dr. Veazy of a lack of stamina in connection with lung infiltrates as early as August 29, 1995. An x-ray of plaintiff's chest on that occasion indicated small, unconsolidated opacities in the upper and mid-portions of plaintiff's bilateral lungs which were considered "diffuse infiltrates. . . with a slight nodular pattern." Another x-ray of plaintiff's chest taken on August 31, 1995, on referral by Dr. Veazy was read by A. H. Wells, M.D. to indicate a differential diagnosis of either "multi-focal . . . atypical pneumonitis," "granulomatous process," or "interstitial pneumonitis."
15. In September 1995, plaintiff was treating with Dr. Veazy for continued pulmonary issues that plaintiff apparently had in common with other members of his family. Plaintiff failed to follow up with a pulmonologist, despite Dr. Veazy's strong recommendation to do so. Plaintiff was again hospitalized on December 25, 1996, for "recurrent bilateral pneumonia with hypoxia." An x-ray taken on December 26, 1996, and compared with the March, 1995, radiology indicated "prominent bilateral infiltrates" the pattern and appearance of which had "not changed since [March, 1995]." Plaintiff was vaccinated againstPneumococcal disease, which is caused by the bacteria Streptococcuspneumoniae and commonly results in pneumonia, on December 27, 1996.
16. On March 23, 2004, plaintiff was treated by his family physician, Dr. D. Michael Pass for problems with asthma that he had since childhood but was getting worse. Dr. Pass noted on that occasion that plaintiff's asthma and allergies had flared up due to the time of year.
17. On May 6, 2004, plaintiff presented to Haywood Regional Medical Center Urgent Care because he was experiencing sharp pains in his chest and breathing difficulties. Plaintiff had been experiencing a progressive worsening of shortness of breath with physical exertion for a period of one to two years. *Page 7 
18. Plaintiff's chest x-rays taken May 6, 2004 indicated extensive lung densities bilaterally. These masses in plaintiff's lungs are typical characteristic findings of massive progressive fibrosis, which is a complication of silicosis. Another complication of silicosis appearing on plaintiff's May 2004 chest x-rays is compensatory emphysematous changes.
19. Plaintiff returned to Dr. Pass on May 7, 2004. A May 10, 2004, CT scan performed on Dr. Pass's referral was considered worrisome for pulmonary bronchogenic neoplasm with bilateral hilar and pulmonary involvement or co-existing pneumonia or co-existing fungal or tuberculus infection.
20. On May 12, 2004, plaintiff was examined by pulmonologist Dr. Michael Todd Cross, on referral from Dr. Pass. Plaintiff complained of a one-year history of progressive shortness of breath and a two-week history of pleuritic chest pain. Based upon his review of plaintiff's chest x-rays and CT scan, as well as his physical examination of plaintiff, Dr. Cross made a working diagnosis of pneumoconiosis. Silicosis is a form of pneumoconiosis. Dr. Cross was concerned that plaintiff had experienced significant toxic dust exposure of an industrial nature, particularly considering plaintiff's metal working history.
21. On May 20, 2004, Dr. Cross performed a transbronchial biopsy of the left upper lobe of plaintiff's lungs, consisting of numerous brushing and washing samples, as well as a minute tissue sample. Plaintiff's biopsy samples were reviewed by pathologist Dr. Meryl L. Goldstein. The pathology specimens revealed no evidence of fungi or other infectious organisms, as well as no evidence of malignancy or pre-cancerous cells. Dr. Goldstein noted that the specimen demonstrated a nodular aggregate of epithelioid histiocytes and multinucleated giant cells associated with refractile crystalline material and calcified debris indicating a non-necrotizing granulomatous inflammation. The crystalline material found in plaintiff's tissue *Page 8 
sample could not be specifically identified because of the small quantity of tissue material obtained.
22. After considering the biopsy results, Dr. Cross was of the opinion that plaintiff had a metal-related or talc-related lung disease, because plaintiff had told Dr. Cross that he did not wear a mask while performing his job machining metal parts. Dr. Cross initially diagnosed plaintiff with Giant Cell Interstitial Pneumonitis (GIP) syndrome. Dr. Cross testified that GIP is a hypersensitivity reaction, which could have caused the lung scarring.
23. Although Dr. Cross was of the opinion that plaintiff had a metal-related lung disease, he declined to opine to any degree of medical certainty that the condition of plaintiff's lungs is the result of plaintiff's exposure to anything in particular at the defendant's facility. Even though Dr. Cross believes that plaintiff has a hypersensitive reaction to an inhalant that has caused his condition, Dr. Cross was not able to determine from plaintiff's work history that plaintiff had been exposed to enough silica dust to cause silicosis.
24. Dr. Cross discussed plaintiff's bronchoscopy and biopsy results with pathologist Dr. Goldstein, who also consulted her pathology colleagues. Although sarcoidosis was a possible diagnosis, the pathologist indicated to Dr. Cross that the lung crystals in plaintiff's lungs were too large to be sarcoid. After conferring with Dr. Goldstein, Dr. Cross concluded that plaintiff's lung disease is unlikely to be sarcoidosis. Dr. Cross admitted that the assessment of Dr. Lipham that plaintiff has an accelerated form of silicosis fits with plaintiff's symptoms and his test results.
25. Plaintiff left Dr. Cross's care after his third appointment with Dr. Cross on July 1, 2004, and did not see another physician for nearly two months thereafter. Plaintiff testified that he left Dr. Cross's care because he believed Dr. Cross to be taking orders from the defendants. *Page 9 
Contrary to plaintiff's hearing testimony, Dr. Harry Lipham testified that plaintiff transferred his care to Dr. Lipham because plaintiff wanted a physician closer to his area.
26. On August 24, 2004, plaintiff saw Dr. Harry Lipham, who is board certified in pulmonology and internal medicine. Based upon (1) his multiple physical examinations of plaintiff, (2) his review of plaintiff's x-rays films and other diagnostic studies, and (3) his assessment of plaintiff's work history, Dr. Lipham has diagnosed plaintiff's condition as silicosis with associated massive progressive fibrosis.
27. Dr. Lipham testified that the fundamental factors necessary to a diagnosis of silicosis are history of exposure to silica, physical examination, chest x-rays, lung function tests, and biopsies, and that he diagnosed plaintiff with silicosis based on those factors. Dr. Lipham opined that plaintiff actually has accelerated silicosis as opposed to simple silicosis. Dr. Lipham testified that accelerated silicosis occurs in people who have had exposure to silicosis for around ten years or so, rather than having exposure for 20, 30, or 40 years.
28. Dr. Lipham has never been to the defendant's Fletcher, North Carolina facility, and has never seen any result of any air sampling conducted at that facility. Although Dr. Lipham agreed that silica particles have to be 5 micrometers in diameter or less in order to be respirable, Dr. Lipham did not know the diameter of the alleged silica dust particles at defendant's facility, if any. Plaintiff apparently showed Dr. Lipham some MSD sheets regarding the materials he machined, and Dr. Lipham, in part, based his assessment on these MSD sheets. However the MSD sheets were not submitted as evidence in this case, and the undersigned can make no findings regarding what they contain.
29. Plaintiff initially told Dr. Lipham on September 20, 2004, that the iron he milled for defendant came as cast iron material that was enclosed in sand and there was sand *Page 10 
episodically in the iron due to defects in its construction that was liberated into the atmosphere into levels that were respirable. Dr. Lipham wrote letters to Dr. Pass, plaintiff's attorney, and defendant on September 20, 2004 indicating that the metal was in a sand mold and also that defects within the metal ended up retaining sand as well and this was machined into the atmosphere into respirable particles." In his letter to Mr. Leicht, Dr. Lipham stated that plaintiff's alleged silicosis is not related to the metal that he was machining, but instead was related to the sand that was present in the castings of the iron.
30. Dr. Lipham's January 26, 2005, office note, produced the day after the January 25, 2005, hearing on plaintiff's claim before the deputy commissioner, states:
 I received a phone call from the patient stating that it occurred to him yesterday that I might have had a misconception concerning the drilling he was doing in the casting at his job as a machinist. He stated that he wished to clarify that there was no visible sand present on the material through which he was drilling. Also, these castings are made in sand, the sand is apparently removed and the block is then painted prior to his actually drilling into this.
 This is certainly different than my memory of the discussion that we had and is also different than my records. I have reviewed his records, however, and I still think that silicosis is by far the most likely etiology of his respiratory difficulties given his history, physical exam, chest x-rays, and CT scans as well as bronchoscopic biopsy findings.
31. Dr. Lipham testified that absent any other evidence of exposure to free silica, plaintiff's employment with defendant caused plaintiff's silicosis. Plaintiff had told Dr. Lipham on September 20, 2004, that he had not had any significant occupational exposures to silica dust prior to working for defendant despite the fact that plaintiff worked for a previous employer where there was a probability that plaintiff was exposed to silicon dust.
32. Dr. Lipham reviewed reports on radiological studies of plaintiff's chest from 1995 and 1996 and agreed that those reports indicate the same process that Dr. Lipham saw on *Page 11 
radiology of plaintiff's chest taken in 2004. Dr. Lipham could not say whether the appearance of plaintiff's chest radiology as of 1995 indicated that plaintiff had alleged exposure to silica prior to starting work for the Employer in 1991.
33. Dr. Lipham has treated multiple patients suffering from silicosis who worked as sandblasters or in quarries or foundries, but made no mention of any silicosis patients who worked in positions such as plaintiff's machining metal parts. Although Dr. Lipham is knowledgeable of the foundry process and had the advantage of utilizing advance computer technology to review and interpret plaintiff's diagnostic studies, Dr. Lipham had no independent knowledge of plaintiff's work environment or alleged silica dust exposure and relied on incorrect information provided by plaintiff which is contrary to the facts found herein.
34. Defendants retained Victor Louis Roggli, M.D., from the Duke University Medical Center to examine plaintiff's biopsy specimen, and to determine whether or not the specimen is consistent with a diagnosis of silicosis. Dr. Roggli has been practicing pulmonary pathology with a specialty in dust-related diseases since 1980. Dr. Roggli's curriculum vitae includes 150 articles either accepted for publication or published in peer-review literature, 27 textbook chapters, and 4 textbooks, all of which Dr. Roggli has authored.
35. Dr. Roggli testified that the refractile crystalline material and calcified debris identified in Dr. Goldstein's pathology report are very likely to be Schaumann bodies made up of either calcium carbonate or calcium oxalate. It is Dr. Roggli's opinion plaintiff does not have silicosis but that plaintiff more likely has sarcoidosis, a hereditary condition that causes unusual immunologic responses. Typical signs and symptoms of sarcoidosis include shortness of breath, radiological patterns mimicking nodular masses most severe in the upper zones of the lungs, and lymph node enlargement. In response to questions from plaintiff's counsel, Dr. Roggli testified *Page 12 
that accelerated silicosis is a term that's used for a very special circumstance where you're exposed to massive amounts of silica and the disease progresses very rapidly.
36. Dr. Roggli testified that an endobronchial or transbronchial biopsy is typically performed for purposes of ruling out sarcoidosis and that a non-necrotizing granuloma in a transbronchial biopsy, like that in plaintiff's transbronchial biopsy, is consistent with sarcoidosis. Sarcoidosis can look like other diseases in clinical and radiological studies, and Dr. Roggli has actually written textbooks about how clinicians should distinguish sarcoidosis from other diseases caused by inhalation of dust, including silicosis. Mistaken diagnosis of silicosis in a person with sarcoidosis is a common difficulty Dr. Roggli has discussed in multiple textbooks.
37. Dr. Roggli has never diagnosed silicosis in any iron worker he has ever examined. Plaintiff is the only iron worker with whom Dr. Roggli has ever made contact who had non-necrotizing granulomas consistent with sarcoidosis.
38. Carl A. Smart, M.D., is a board certified pulmonary critical care physician who owns and operates Pulmonary Critical Care in Mecklenburg County, North Carolina. Dr. Smart examined plaintiff at defendants' request on January 19, 2005, for purposes of rendering an opinion as to plaintiff's pulmonary condition.
39. Plaintiff told Dr. Smart that his job with defendant involved using cast iron that was covered with some degree of sand or sand-like material. Dr. Smart testified that a telephone conversation between plaintiff and Dr. Lipham documented in Dr. Lipham's January 26, 2005 note contradicts what plaintiff told Dr. Smart. Plaintiff told Dr. Lipham that there was no visible sand on the iron he milled for defendant, while plaintiff told Dr. Smart just six days earlier that there was sand covering the iron. Plaintiff also failed to tell Dr. Smart that the iron he milled for defendant came to the facility painted as opposed to covered in sand. *Page 13 
40. Dr. Smart is of the opinion that plaintiff probably does not have silicosis. While he finds plaintiff's biopsy results more indicative of sarcoidosis than silicosis, Dr. Smart is not positive that plaintiff has sarcoidosis, either, because plaintiff's signs and symptoms could also indicate a chronic granulomatous process such as fungal process, berylliosis, or hypersensitivity pneumonitis. Dr. Smart read the report from Dr. Goldstein's review of plaintiff's lung biopsy specimen from May 2004, to indicate that plaintiff had a non-necrotizing granulomatous process, which Dr. Smart testified indicates a differential diagnosis including sarcoidosis, hypersensitivity pneuomonitis, and berylliosis. Dr. Smart testified that plaintiff's biopsy findings increase the likelihood that plaintiff's true diagnosis is sarcoidosis.
41. Dr. Smart testified that there is no independent evidence that what may look like silicotic nodules on radiology of plaintiff's chest are silicotic nodules as opposed to an inflammatory process, and that sarcoid can look like a tremendous amount of fibrosis, and inflammatory process, and can actually cause white outs of the lungs. Dr. Smart testified that an open surgical biopsy of the lungs, a risky procedure, is necessary to be certain as to plaintiff's exact condition. None of the physicians have suggested that plaintiff undergo this risky procedure.
42. Dr. Smart testified that reports on radiology taken of plaintiff's lungs in March 1995 and December 1996 suggest that whatever has caused the condition of plaintiff's lungs has been an ongoing process since 1995. Dr. Smart believes that whatever was causing the appearance of plaintiff's lungs on radiology taken in 1995 is the same thing causing the appearance of plaintiff's lungs in 2004.
43. In assessing the medical evidence and weighing the opinions of the physicians, the undersigned find the opinions of Dr. Roggli and Dr. Smart to be more persuasive and the *Page 14 
same are given more weight. These opinions indicate that plaintiff has most likely developed sarcoidosis, which is most likely a hereditary condition. Therefore, the undersigned find that plaintiff developed sarcoidosis and not silicosis.
44. The evidence fails to establish that plaintiff was exposed to silica dust in his work with defendant, and the undersigned find there is not a causal connection between plaintiff's condition and his work with defendant.
45. Due to the chronic condition of plaintiff's lungs, he gets short of breath simply walking up a single flight of stairs. Plaintiff is unable to engage in any strenuous physical activity because of his shortness of breath and fatigue. Due to his serious lung disease, plaintiff has been unable to return to work for the defendant, and has been unable to return to work for any other employer.
 * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. There is insufficient evidence before the undersigned in this case to establish a causal connection between plaintiff's sarcoidosis and his work with defendant. Booker v Duke Medical Center, 297 N.C. 458,256 S.E.2d 189, (1979).
2. Plaintiff failed to establish that he suffered from the occupational disease silicosis. Even if plaintiff had shown that he developed silicosis, plaintiff did not present sufficient competent evidence tending to show a proximate causal relationship between plaintiff's alleged occupational silicosis and plaintiff's work for defendant to allow plaintiff to recover *Page 15 
compensation benefits. N.C. Gen. Stat. § 97-53(25); See Holley v. Acts,Inc., 357 N.C. 228, 581 S.E.2d 750 (2003); Duncan v. City ofCharlotte, 234 N.C. 86, 66 S.E.2d 22 (1951).
 * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for an occupational lung disease resulting from plaintiff's employment with the defendant is hereby DENIED.
2. Defendants shall pay the costs.
This the 12th day of March, 2007.
 S/_______________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/________________ PAMELA T. YOUNG COMMISSIONER.
 S/________________ DIANNE C. SELLERS COMMISSIONER.